**Karl PFAFF; Elizabeth Pfaff, Petitioners,**

v.

**U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, Respondent.**

No. 94–70898.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 8, 1996.

Decided July 2, 1996.

---

Catherine W. Smith, Edwards, Sieh, Hathaway, Smith & Goodfriend, Seattle, Washington, for petitioners.

Gregory B. Friel, United States Department of Justice, Washington, D.C., for respondent.

Before: HALL and TROTT, Circuit Judges, and RAFEEDIE,* District Judge.

## OPINION

CYNTHIA HOLCOMB HALL, Circuit Judge:

The petitioners are private landlords who have asked us to review a decision of the Department of Housing and Urban Development ("HUD") finding them liable for "familial status" discrimination under the Fair Housing Act ("FHA"). The question presented is whether the petitioners' facially neutral, numerical occupancy restriction illegally discriminates against families with children. Declining to reach the merits of the prima facie case, we hold that the petitioners have successfully rebutted any prima facie case against them. Furthermore, we admonish HUD for its heavy-handed conduct in this case. We grant the petition.

### I

This story begins in the spring of 1992 with an eviction notice and Beckie Nymoen's search for a new house in the Bellingham, Washington area. There were all the usual considerations to weigh: budget, location and adequate space for the family's three young children. She and her husband, Michael Nymoen, decided to aim for a three-bedroom rental in the range of $800 to $900 a month. She would look in an area called Sudden Valley which, they felt, would be both near to Michael Nymoen's work and hospitable to the children.

Beckie Nymoen contacted Bev Talley of Sun Mark Properties. Two houses listed with Sun Mark appeared to fit the Nymoen's specifications. One of these, located at 5 Basin View Court, Beckie Nymoen toured with her daughter and liked very much. The house rented for $850 a month. It had 1200 square feet, a living room, dining room, kitchen, deck, two bathrooms, an "undersized" garage, no basement and very little yard. By way of sleeping space, the house had a master bedroom, another 10' × 10' bedroom, and a "den" opening directly into the main living area, which could also have

been used as a bedroom. The rest of the family saw the house from the outside and agreed that it would meet their needs. Beckie and Michael filled in the rental application and left a deposit of $105. They passed their creditworthiness screening with Sun Mark. Bev Talley then got in touch with the owners, Karl and Elizabeth Pfaff, who are the petitioners in this matter.

The Pfaffs are a retired couple in their 70s who live primarily on the rental income from eight single-family houses around Bellingham. They have been landlords for some time. In previous years, when they lived in Memphis, Tennessee, they bought run-down houses which they would renovate with their own labor and then rent. Today they own only new houses because they can no longer handle physical home improvement work. They bought the house at 5 Basin View Court in 1989, for use both as a rental and as a potential home for themselves. They expect that, because this house is smaller than their present residence in interior and yard space, it will be easier to maintain as they grow older.

The Pfaffs' business strategy has been to keep their rental units in very good condition, and rent them at slightly below-market rates, in order to encourage their tenants to remain in residence for long periods of time. In addition, the Pfaffs limit the number of occupants in each house. The occupancy limit varies with the size of the dwelling and its lot, the number of bedrooms, and the presence of various other amenities and characteristics (bathrooms, layout, traffic patterns inside the house, and so forth). They arrive at particular limits based on their experience in the business and "common sense." No state or local occupancy standards control, and the decision has always been theirs to make. In four of their larger Bellingham area properties the Pfaffs allow families of five. Unlike the house on Basin View Court, these properties have more than one living area, a finished basement, or both. The house on Basin View Court has always been let to families of four.

---

* The Honorable Edward Rafeedie, United States District Judge for the Central District of California, sitting by designation.

The Pfaffs have always rented to families with children: at the time of the administrative hearing, families with as many as three children lived in seven of their properties. The Pfaffs also rent to families of diverse configurations. In one of their units lives a family of two parents, two children, and a grandparent, who lives in the finished basement.

The Basin View Court listing was the Pfaffs' first experience with Sun Mark as a broker. When Bev Talley rang Karl Pfaff with news of the Nymoens as prospective tenants, and began to relate to him the Nymoens' many good points, he interrupted her once he heard that they were a family of five. He wished to rent to a family of four. Bev Talley protested. In a subsequent meeting between the Pfaffs and Sun Mark, Bev Talley told the Pfaffs that she believed their occupancy restriction ran afoul of the fair housing laws, but the Pfaffs were undeterred. They withdrew their listing with Sun Mark and later found a family of four to take the lease at the original price.

Very disappointed, the Nymoens sought other accommodation, as their deadline to move was approaching. They took a slightly larger three-bedroom house at 16 Lost Lake Court, located outside Sudden Valley, for $975 a month. This place had a finished basement which unhappily began flooding shortly after their arrival, and has been of little use to them since. Their move was fraught with inconvenience. The existing tenants wanted to wait until they closed on a house purchase, so the Nymoens obtained a delay of their departure date from their landlord. When this new deadline arrived, the Lost Lake Court tenants were not yet ready to move. In compromise, the tenants vacated the premises but left their furniture in the Nymoen's garage, which Michael Nymoen had intended to use for storing his tools. Also, the Nymoens were forced to move in a short span of time, and so they were forced to incur the expense of hiring a moving van. They would have avoided this expense had they rented the Pfaffs' house because they would have had an entire month to move their belongings piecemeal, using their own vehicle.

The Nymoens felt angry for having lost the Basin View Court house. They reported feeling unfairly judged on the basis of their family size. Beckie Nymoen described the experience as "degrading." On January 22, 1993, they filed an amended complaint with the Secretary of HUD, alleging violations of Title VIII of the Civil Rights Act of 1968, enacted as the Fair Housing Act, 42 U.S.C. § 3601, *et seq.*, and amended by the Fair Housing Amendments Act of 1988, Pub.L. No. 100–430, 102 Stat. 1626 (1988) ("1988 Amendments"). The Secretary investigated and issued a Determination of Reasonable Cause and Charge of Discrimination on the grounds that the Pfaffs had discriminated against the Nymoens based on their "familial status." *See* FHA § 804(a), (b), codified at 42 U.S.C. § 3604(a), (c) (prohibiting family status discrimination). The cause was tried before an administrative law judge ("ALJ"), who on October 27, 1994 ruled in favor of the Secretary, on behalf of the Nymoens.

The ALJ found that HUD had established a prima facie case of discrimination by "disparate impact," and that the Pfaffs had failed to meet their burden of rebuttal. According to the ALJ, the prima facie case was established when the Nymoens, a family of five, were denied the opportunity to rent the Basin View Court house and a family of four was admitted in their place. HUD statistics demonstrated that households of five overwhelmingly comprise families with children in Whatcom County. To rebut this prima facie showing of disparate impact, the ALJ required that the Pfaffs demonstrate a "compelling business necessity" for their policy. Under this standard, which he described as "akin to constitutional strict scrutiny," the Pfaffs were first obliged to articulate a business necessity and second to show that their numerical restriction constituted the least restrictive means to that end.

The ALJ held that the Pfaffs had failed to produce evidence to support their subjective belief that a family of five would diminish the economic value of the premises any more than would a family of four. Furthermore, he found that the Pfaffs' proffered goal, to "maintain the economic value of the property," would have been adequately advanced by

other measures, including "detailed maintenance requirements, more frequent inspections, higher security deposits, or more careful tenant screening." The ALJ found the Pfaffs in violation of 42 U.S.C. §§ 3604(a) (refusal to rent on a discriminatory basis) and (c) (making discriminatory statements in the course of business). He ordered damages, an injunction and a civil penalty.

The ALJ awarded $4,212.61 in compensatory damages and $20,000 in damages for emotional distress. The latter sum was meant to compensate for the Nymoens' feelings of embarrassment, humiliation and anger, and for the resultant strain on the family. Beckie Nymoen testified that in the wake of the incident her husband withdrew from contact with her and the children. (The couple subsequently separated, the ALJ noted). Finally, the ALJ pointed to Karl Pfaff's "blatant disregard" for the FHA's prohibition on family status discrimination. Comparing this case to a number of others, including *HUD v. Blackwell*, Fair Housing–Fair Lending (P–H) para. 25,001, *aff'd*, 908 F.2d 864 (11th Cir.1990) (awarding $40,000 to family denied opportunity to rent on grounds of race), the ALJ arrived at the $20,000 figure.

Next, the ALJ assessed against the Pfaffs a civil penalty of $8,000. Consulting the legislative history of the 1988 Amendments, he determined that the civil penalty should account for the "nature and circumstances of the violation, the degree of culpability, any history of prior violations, the financial circumstances of that respondent and the goal of deterrence, and other matters as justice may require." H.R.Rep. No. 711, 100th Cong., 2d Sess. 37 (1988), *reprinted in* 1988 U.S.C.C.A.N. 2173, 2198. He again described the Pfaffs' strident disregard for the FHA even after a potential violation was brought to their attention, and also their long experience as landlords, which should have put them on notice as to the requirements of the law. He also found them inexcusably callous for people who had themselves started out poor and living in cramped quarters. Finally, he noted that given their financial situation a substantial penalty would be necessary to punish and deter. The only factor in their favor was the absence of a prior

judgment against them. However, the ALJ declined the government's invitation to impose the maximum penalty with the observation that "it is not hard to imagine cases even more egregious than this one [citing *Blackwell* ]."

Finally, the ALJ enjoined the Pfaffs from further discriminating against the Nymoens. He ordered them to keep records and submit reports to HUD for three years documenting their compliance with the FHA, and to inform their property management agents of the terms of the order.

■ Because the Pfaffs timely filed this petition, we have jurisdiction under section 812(i) of the Fair Housing Act, 42 U.S.C. § 3612(i) (incorporating 28 U.S.C. § 2342(6)). We review the ALJ's conclusions of law de novo. *See Ghaly v. INS,* 58 F.3d 1425, 1429 (9th Cir.1995) (reviewing de novo conclusions of law by Board of Immigration Appeals with deference to interpretation by INS of its enabling legislation); *Borregard v. National Transp. Safety Bd.,* 46 F.3d 944, 945 (9th Cir.1995) (same with respect to NTSB); *Flaten v. Secretary of Health and Human Services,* 44 F.3d 1453, 1457 (9th Cir.1995) (same with respect to HHS); *Hunt v. Director, Office of Workers' Compensation Programs, U.S. Dept. of Labor,* 999 F.2d 419, 421 (9th Cir.1993) (same with respect to OWCP).

## II

In pursuit of its stated policy "to provide, within constitutional limitations, for fair housing throughout the United States," 42 U.S.C. § 3601, the FHA as amended in 1988 makes it unlawful

to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, *familial status,* or national origin.

42 U.S.C. § 3604(a) (emphasis added). "Familial status" refers to the presence of minor children in the household. 42 U.S.C. § 3602(k).

In this action the government accuses the Pfaffs of discriminating against families with children by refusing to rent the house on Basin View Court to households with five or

more members. The government argues that the Pfaffs' numerical occupancy restriction has a disparate impact on families with children which is prima facie discriminatory, and that the Pfaffs have failed to rebut this prima facie case. The Pfaffs dispute that the government established a prima facie case against them. But even assuming it has done so, they contend that they have successfully rebutted the prima facie case by articulating nondiscriminatory business reasons for their four-person occupancy restriction.

We first consider the prima facie case and decline to reach the merits. We then turn to the rebuttal and find that the Pfaffs have met their burden to rebut any prima facie case against them. HUD's reprehensible conduct in this case renders any other result unfair.

**A**

 To establish a prima facie case of disparate impact under the FHA, "a plaintiff must show at least that the defendant's actions had a discriminatory effect." *Keith v. Volpe*, 858 F.2d 467, 482 (9th Cir.1988) (citing *Resident Advisory Bd. v. Rizzo*, 564 F.2d 126, 146–48 (3d Cir.1977); *Smith v. Town of Clarkton, North Carolina*, 682 F.2d 1055, 1065 (4th Cir.1982); *Metropolitan Housing Dev. Corp. v. Village of Arlington Heights*, 558 F.2d 1283, 1289–90 (7th Cir.1977), *cert. denied*, 434 U.S. 1025, 98 S.Ct. 752, 54 L.Ed.2d 772 (1978); *United States v. City of Black Jack*, 508 F.2d 1179, 1184–85 (8th Cir. 1974), *cert. denied*, 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694 (1975)). "Discriminatory effect" describes conduct that actually or predictably resulted in discrimination. *Keith*, 858 F.2d at 482 (citing *Black Jack*, 508

F.2d at 1184–85). As we have stated in an analogous context: [1]

> To make out a prima facie case of discrimination under the disparate impact theory the plaintiff must show: "(1) the occurrence of certain outwardly neutral ... practices, and (2) a significantly adverse or disproportionate impact on persons of a particular [type] produced by the [defendant's] facially neutral acts or practices."

*Palmer v. United States*, 794 F.2d 534, 538 (9th Cir.1986) (Age Discrimination in Employment Act, or "ADEA") (citing *Spaulding v. University of Wash.*, 740 F.2d 686, 705 (9th Cir.), *cert. denied*, 469 U.S. 1036, 105 S.Ct. 511, 83 L.Ed.2d 401 (1984)).

Here, the ALJ held that HUD successfully stated a prima facie case against the Pfaffs by (i) identifying an occupancy restriction and (ii) demonstrating with statistical evidence that the restriction would significantly impact families with children. The ALJ found that the Pfaffs excluded a five-person household in favor of a four-person household pursuant to a policy which disproportionately burdened families with children. He explicitly found there to be no evidence of intentional discrimination. Having found sufficient evidence of disparate impact, the ALJ concluded that a prima facie case was established. Against this conclusion, the Pfaffs make two arguments. First, they contend that in addition to discriminatory effect some evidence of discriminatory intent must be produced. Second, they argue that even if no evidence of intent is necessary, the government failed to produce statistical evidence sufficient to establish a prima facie case.

 As to the first argument, we find no support for the proposition that a finding of

---

1. We may look for guidance to employment discrimination cases. *Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 926, 934–35 (2d Cir.), *aff'd*, 488 U.S. 15, 109 S.Ct. 276, 102 L.Ed.2d 180 (1988) (Title VII analysis is persuasive in interpreting Title VIII); *see also City of Edmonds v. Oxford House, Inc.*, —— U.S. ——, ——, 115 S.Ct. 1776, 1780, 131 L.Ed.2d 801 (1995) (reasoning by analogy from Title VII case); *Rizzo*, 564 F.2d at 146–48 (same); *Arlington Heights*, 558 F.2d at 1288–89 (same).

Here we have found it useful to rely on our age discrimination jurisprudence. First, age discrimination cases often present thorny questions

of degree, which resemble those faced by the parties in this matter. Just as the Pfaffs had to choose between a family of four and a family of five in its rental decision, an employer may have to choose between a 60–year–old and a 55–year–old—or a 59–year–old. While an employer need not always hire the oldest applicant under the ADEA, he may violate the ADEA by failing to do so in certain cases. Likewise, under the 1988 Amendments, a landlord need not always rent to the largest family submitting an application; however at some point he can no longer take the family's size into consideration in making his rental decision.

intent is required to establish a prima facie case of disparate impact under the FHA.[2] The Pfaffs argue that while an effects test might be acceptable when the government is the defendant, private landlords ought to be immune from suit unless the government also shows their intent to discriminate. The Pfaffs cite 42 U.S.C. § 3607(b)(1) to support this interpretation of the FHA.

However, this provision, which permits "any reasonable *local, State,* or *Federal* restrictions regarding the maximum number of occupants permitted to occupy a dwelling" (emphasis added), appears to undermine their argument by lessening the burden of the fair housing laws on government entities as compared to private landlords. *See also City of Edmonds v. Oxford House, Inc.,* —— U.S. ——, —— n. 9, 115 S.Ct. 1776, 1782 n. 9, 131 L.Ed.2d 801 (1995) ("Section 3607(b)(1) makes it plain that *pursuant to local prescriptions* on maximum occupancy, landlords legitimately may refuse to stuff large families into small quarters.") (emphasis added). When the question of facially neutral, numerical occupancy restrictions arose in Congress during consideration of the 1988 Amendments, Congress chose to give special deference to government-imposed occupancy limits only. *See* H.R.Rep. No. 711 at 31, *reprinted in* 1988 U.S.C.C.A.N. at 2192 (stating congressional intention not to limit reasonable, nondiscriminatory occupancy limits by federal, state and local governments). Congress made no comparable provision for private occupancy policies.

■ Next, the Pfaffs contend that even if their lack of discriminatory intent does not exonerate them, they should nevertheless prevail because the government has failed to meet the evidentiary burden for a prima facie case. To establish a prima facie case of discrimination without intent, the charging party must "prove the discriminatory impact at issue; raising an inference of discriminatory impact is insufficient." *Palmer,* 794 F.2d at 538–39 (citing *Moore v. Hughes Helicopters, Inc.,* 708 F.2d 475, 482 (9th Cir.1983)). Valid statistical evidence is admissible for this purpose. *Id.* at 539. A party charged with discrimination may diffuse a prima facie case against him, and hence avoid the need to supply a legally sufficient, nondiscriminatory reason in rebuttal, by successfully challenging the statistical basis of the charge. *See Rose v. Wells Fargo & Co.,* 902 F.2d 1417, 1424 (9th Cir.1990); Civil Rights Act of 1991, § 105, 42 U.S.C. § 2000e–2(k)(1)(B)(ii) (1996) (respondent need not assert business necessity defense if he has shown that the employment practice does not cause disparate impact).

■ We cannot consider this second argument because the Pfaffs failed to raise it below. Before the ALJ, counsel for the Pfaffs failed to contest the validity of the government's statistics. They astonishingly "stipulated" that the policy of excluding households of five from a rental property would disproportionately impact families with children. Without the benefit of a record developed in an adversarial proceeding we are left with important evidentiary questions unresolved concerning the soundness of the government's statistical showing. "As a general rule, one may not urge as a ground for reversal a theory not presented to the trial court." *Guillory v. County of Orange,* 731 F.2d 1379, 1383 (9th Cir.1984). Accordingly, we will not consider the statistical evidence against the Pfaffs.

Without reaching the merits of the prima facie case, we proceed to consider the strength of the Pfaff's rebuttal.

---

**2.** *See, e.g., United States v. Yonkers Bd. of Educ.,* 837 F.2d 1181, 1217 (2d Cir.1987), *cert. denied,* 486 U.S. 1055, 108 S.Ct. 2821, 100 L.Ed.2d 922 (1988) ("[T]he consensus is that a plaintiff need prove only discriminatory effect, and need not show that the decision complained of was made with discriminatory intent."); *Huntington Branch, NAACP,* 844 F.2d at 934–35 ("The Act's stated purpose to end discrimination requires a discriminatory effect standard; an intent requirement would strip the statute of all impact on de facto segregation."); *Black Jack,* 508 F.2d at 1184–85 ("Effect, and not motivation, is the touchstone, in part because clever men may easily conceal their motivations, but more importantly, because ... 'we now firmly recognize that the arbitrary quality of thoughtlessness can be as disastrous and unfair to private rights and the public interest as the perversity of a willful scheme.'") (citations omitted).

**B**

The ALJ held that the Pfaffs failed to rebut the prima facie case against them. Relying on the Secretary's decision in *HUD v. Mountain Side Mobile Estates* (*Mountain Side I* ), 2 Fair Housing–Fair Lending (P–H) para. 25,053 (HUD Sec'y, July 19, 1993), *modified* 2 Fair Housing–Fair Lending (P–H) para. 25,064 (HUD Sec'y, October 20, 1993), *rev'd in part,* 56 F.3d 1243 (10th Cir. 1995), he required the Pfaffs to produce a "compelling business necessity" to justify their numerical occupancy restriction, and to show that their policy was the "least restrictive means" to that end. The ALJ determined that the Pfaffs failed to satisfy this standard. In his view, first, their asserted justifications were "subjective," and hence were not "compelling." Second, even if the reasons offered by the Pfaffs had been sufficiently weighty, they would nonetheless be inadequate, he felt, because "alternative measures" might have served these purposes equally well.

We hold that the ALJ erred in applying the *Mountain Side* test in this case. Even if the appropriate standard of rebuttal in disparate impact cases normally requires a compelling business necessity,[3] the record in this case leads us to the conclusion that it would be fundamentally unfair to hold the Pfaffs to this standard given HUD's truly appalling conduct in this matter. We have the authority to set aside an enforcement action when the agency has acted with arbitrariness or caprice. 5 U.S.C. § 706(2)(A); *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 2782–83, 81 L.Ed.2d 694 (1984). We do so here.

HUD would have us show deference to the standard announced in *Mountain Side* because it represents the Secretary's considered interpretation of the fair housing laws. The Secretary's interpretation of the FHA "ordinarily commands considerable deference" because "HUD [is] the federal agency primarily assigned to implement and administer Title VIII." *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 107, 99 S.Ct. 1601, 1611, 60 L.Ed.2d 66 (1979) (citing "familiar principles" of *International Brotherhood of Teamsters v. Daniel,* 439 U.S. 551, 566 n. 20, 99 S.Ct. 790, 800 n. 20, 58 L.Ed.2d 808 (1979); *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *Trafficante v. Metropolitan Life Ins. Co.,* 409 U.S. 205, 210, 93 S.Ct. 364, 367, 34 L.Ed.2d 415 (1972)). Furthermore, it is an established principle of administrative law that "the choice between rulemaking and adjudication lies in the first instance within the [agency's] discretion." *NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 294, 94 S.Ct. 1757, 1771, 40 L.Ed.2d 134 (1974) (citing *NLRB v. Wyman–Gordon Co.,* 394 U.S. 759, 765–66, 89 S.Ct. 1426, 1429–30, 22 L.Ed.2d 709 (plurality opinion), 772 (Black, J., concurring) (1969); *SEC v. Chenery Corp.,* 332 U.S. 194, 201, 67 S.Ct. 1575, 1579, 91 L.Ed. 1995 (1947)); *see also American Hosp. Ass'n v. NLRB,* 499 U.S. 606, 611–13, 111 S.Ct. 1539, 1543, 113 L.Ed.2d 675 (1991). Accordingly, we review with deference an agency's interpretation of the statute that it has responsibility to enforce, whether that interpretation emerges from an adjudicative proceeding or administrative rulemaking. *Western Pioneer, Inc. v. United States,* 709 F.2d 1331, 1335 (9th Cir.1983) (citing *FEC v. Democratic Senatorial Campaign Comm.,* 454 U.S. 27, 32, 102 S.Ct. 38, 42, 70 L.Ed.2d 23 (1981)).

---

**3.** *See, e.g., Betsey v. Turtle Creek Assocs.,* 736 F.2d 983, 988 (4th Cir.1984) (FHA); *Rose,* 902 F.2d at 1424 (ADEA); *Gutierrez v. Municipal Ct. of S.E. Judicial Dist.,* 838 F.2d 1031, 1041–42 (9th Cir. 1988) (Title VII) (citing *Robinson v. Lorillard Corp.,* 444 F.2d 791, 798 (4th Cir.), *cert. dismissed,* 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971); *Williams v. Colorado Springs, Sch. Dist. No. 11,* 641 F.2d 835, 842 (10th Cir.1981)).

The burden of rebuttal is said to be heavier in cases of disparate impact than disparate treatment. This is because it is often harder to establish a prima facie case of disparate impact than disparate treatment. Under the disparate impact theory, a plaintiff must prove *actual* discriminatory effect, and cannot rely on inference. *Moore v. Hughes Helicopters,* 708 F.2d at 482 (disparate impact "more exacting" than disparate treatment); *compare, e.g., Soules v. HUD,* 967 F.2d 817, 823 (2d Cir.1992) (requiring only "legitimate reason" to rebut prima facie case of disparate treatment under FHA) *with United States v. Badgett,* 976 F.2d 1176, 1180 (8th Cir.1992) (inquiring whether reason offered in rebuttal is "reasonable" in FHA disparate treatment case).

748

■ Justice dictates, however, that our general rule of deference to announcements of law by adjudication have its exceptions. As the Supreme Court has cautioned, "there may be situations where the [agency's] reliance on adjudication would amount to an abuse of discretion...." *Bell Aerospace,* 416 U.S at 294, 94 S.Ct. at 1771. Such a situation may present itself where the new standard, adopted by adjudication, departs radically from the agency's previous interpretation of the law, where the public has relied substantially and in good faith on the previous interpretation, where fines or damages are involved, and where the new standard is very broad and general in scope and prospective in application. *Bell Aerospace,* 416 U.S. at 295, 94 S.Ct. at 1772; *Ford Motor Co. v. FTC,* 673 F.2d 1008, 1009–10 (9th Cir.1981); *Patel v. INS,* 638 F.2d 1199, 1203–05 (9th Cir.1980); *Ruangswang v. INS,* 591 F.2d 39, 44 (9th Cir.1978); *see also Ford Motor,* 673 F.2d at 1009 (retroactive application of new rule disfavored when adopted by adjudication). The instant facts fit squarely within this narrow class of cases.

There can be no question that the *Mountain Side* standard is broad, general, and prospective in application. Likewise, as the Pfaffs' case shows, parties who violate the new standard face onerous penalties, injunctions, government surveillance, and liability in damages. But most egregiously, HUD has made inconsistent and misleading representations to those regulated by the FHA and, in so doing, has led them down the garden path. HUD's original interpretation of the 1988 amendments stated:

[T]here is no support in the statute or its legislative history which indicates any intent on the part of Congress to provide for the development of a national occupancy code....

On the other hand, there is no basis to conclude that Congress intended that an owner or manager of dwellings would be unable in any way to restrict the number of occupants who could reside in a dwelling. Thus, the Department believes that *in appropriate circumstances, owners and managers may develop and implement reasonable occupancy requirements based on factors such as the number and size of sleeping areas or bedrooms and the overall size of the dwelling unit.* In this regard, it must be noted that, in connection with a complaint alleging discrimination on the basis of familial status, *the Department will carefully examine any such nongovernmental restriction to determine whether it operates unreasonably* to limit or exclude families with children.

Implementation of the Fair Housing Amendments Act of 1988, 54 Fed.Reg. 3232, 3237 (January 23, 1989) (emphasis added). In short, "reasonableness" defined the original standard.

■ HUD's statement suggests to us that a facially neutral, numerical occupancy restriction may permissibly be based on a house's size and the number of bedrooms it contains. This is a far cry from requiring landlords to produce a compelling business necessity to justify any numerical occupancy limit. We conclude that *Mountain Side's* "compelling business necessity" rule departs abruptly from HUD's preexisting "reasonableness" standard. Radically inconsistent interpretations of a statute by an agency, relied upon in good faith by the public, do not command the usual measure of deference to agency action. *INS v. Cardoza–Fonseca,* 480 U.S. 421, 447 n. 30, 107 S.Ct. 1207, 1221 n. 30, 94 L.Ed.2d 434 (1987) (citing *Watt v. Alaska,* 451 U.S. 259, 273, 101 S.Ct. 1673, 1681, 68 L.Ed.2d 80 (1981); *General Elec. Co. v. Gilbert,* 429 U.S. 125, 143, 97 S.Ct. 401, 411–12, 50 L.Ed.2d 343 (1976)); *Bell Aerospace,* 416 U.S. at 295, 94 S.Ct. at 1772; *see Ford Motor,* 673 F.2d at 1010; *Patel,* 638 F.2d at 1205; *Ruangswang,* 591 F.2d at 44.[4]

---

4. We do not mean to suggest that an agency can never adapt its interpretation of a statute in the light of experience, or that administrative adjudication is a presumptively invalid means to make such changes. Adjudication has distinct advantages over rulemaking when the agency lacks sufficient experience with a particular problem to warrant ossifying a tentative judgment into a black letter rule; still other solutions may be so specialized and variable as to defy accommodation in a rule. *Chenery,* 332 U.S. at 202–03, 67 S.Ct. at 1580–81. "There is thus a very definite place for the case-by-case evolution of statutory standards." *Id.* at 203, 67 S.Ct. at 1581; *see*

Finally, we note that the Pfaffs were prosecuted for an act which apparently would not have been a violation at the time the Pfaffs rejected the Nymoens' rental application. The events underlying this case took place in the spring of 1992, but the *Mountain Side* decision came down the following year, and was on appeal, albeit in the Tenth Circuit, until 1995. The element of retroactivity in this case only amplifies the unfairness of holding the Pfaffs to the *Mountain Side* standard.

■ Following HUD's original "reasonableness" standard in this case, we think the Pfaffs' policy sufficient. It is certainly reasonable to seek to preserve the value of one's property, as the Pfaffs sought to do, and a numerical limitation on occupancy here advances this legitimate business purpose. The only real question for the Pfaffs was whether to impose a four-person limit or a more permissive one. To arrive at the four-person limit, the Pfaffs noted that the house on Basin View Court was very small, as were its yard and its bedrooms for children. A property manager, who spoke as an expert witness at the administrative hearing, testified to the reasonableness of this occupancy limit in the light of the Pfaffs' goals and the general practice of landlords in the area. In our view, the Pfaffs' facially neutral, numerical occupancy restriction was hardly an unreasonable means under existing law to prevent the dilapidation of their little house.

We are most troubled that in this especially complex area of the law, in which private individuals may be subject to heavy-handed enforcement proceedings, the Secretary has done so little to enlighten the public as to what he expects of them. HUD should spare a thought for the law-abiding property owner, because the familial status amendment presents particularly difficult questions of compliance. Accepting arguendo that larger households tend disproportionately to include families with children, it would seem that any facially neutral, numerical occupancy restriction above a certain threshold number will exclude large families in significant degree. Where may landlords like the Pfaffs safely draw the line? According to HUD, a four-person limit was too restrictive for the house on Basin View Court. Would a five-person rule have survived scrutiny? Six? Seven? It is one of HUD's functions to develop expertise on the problem of housing discrimination, 42 U.S.C. § 3608(e) (duty to study and report), and, on the basis of this expertise, to exercise its broad powers of enforcement and regulation. 42 U.S.C. §§ 3608(a), (b) (HUD's authority to administer the FHA); 3614a (rulemaking authority). If HUD finds the line-drawing question difficult, imagine the position of Karl and Elizabeth Pfaff.[5]

HUD's actions here fall well outside the limits of good—or acceptable—government, and so we grant the petitioners the relief they seek.[6] We also express our hope that

---

*also, FCC v. National Citizens Comm. for Broadcasting,* 436 U.S. 775, 811, 98 S.Ct. 2096, 2120, 56 L.Ed.2d 697 (1978).

The disadvantage to adjudicative procedures is the lack of notice they provide to those subject to the agency's authority. While some measure of retroactivity is inherent in any case-by-case development of the law, and is not inequitable per se, this problem grows more acute the further the new rule deviates from the one before it. Adjudication is best suited to incremental developments to the law, rather than great leaps forward. The APA contains numerous mechanisms, such as the notice and comment rulemaking procedure, by which the public is given notice of proposed changes before they occur. *See generally* APA §§ 552, 553, 557. For this reason, the Supreme Court has concluded that "rulemaking is generally a better, fairer, and more effective method" of announcing a new rule than ad hoc adjudication. *Community Television of S. Cal. v. Gottfried,* 459 U.S. 498, 511, 103 S.Ct. 885, 893, 74 L.Ed.2d 705 (1983).

5. The ALJ, too, had this difficulty, and expressed his frustration with HUD's position at the hearing. He repeatedly asked counsel for the government whether HUD had promulgated any regulations, or published any statement of policy, to inform his decision on the legality of numerical occupancy restrictions.

Apparently HUD has, or has had in the past, "a rule of thumb that an occupancy policy of two persons per bedroom is presumptively reasonable." *Badgett,* 976 F.2d at 1179 (citing HUD document: *Memorandum for Regional Counsel: Fair Housing Enforcement Policy* ). If so, it seems that the agency has never published this guideline.

6. We note that the Tenth Circuit, which is only other circuit to have confronted the legality of the *Mountain Side* standard, also struck it down, albeit on different grounds. *Mountain Side II,* 56 F.3d 1243.

HUD will avoid such incidents in the future by providing the public with guidance adequate to enable honest people to comply with the 1988 Fair Housing Amendments Act.

### III

Because HUD acted arbitrarily and capriciously in bringing the present enforcement action against the Pfaffs under 42 U.S.C. § 3604(a), we reverse the order of the ALJ and direct that the Charge of Discrimination be dismissed.

The petition is GRANTED.[7]

---

**7.** Counsel for the Pfaffs has inexplicably failed to support its petition with any argument pertaining to the charge under section 3604(c), which prohibits discriminatory statements in the course of renting property. Normally, issues unsupported by argument are deemed abandoned. *Leer v. Murphy*, 844 F.2d 628, 634 (9th Cir.1988). We nevertheless grant the petition with respect to section 3604(c) to avoid "manifest injustice." *See id.*