# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

F. G. BUDNICK, a married man;
TEMPO INC., a Michigan
corporation,
　　　　　　*Plaintiffs-Appellants,*

　　　　　　v.

TOWN OF CAREFREE, a body
corporate; EDWARD C. MORGAN,
personally and in his official
capacity as Mayor and Town
Councilmember; BOB COADY; MIKE
EICHER; WAYNE FULCHER,
personally and in their official
capacities as Town
Councilmembers,
　　　　　　*Defendants-Appellees.*

No. 06-15841

D.C. No.
CV-02-01420-SMM

OPINION

Appeal from the United States District Court
for the District of Arizona
Stephen M. McNamee, District Judge, Presiding

Argued and Submitted
February 13, 2008—San Francisco, California

Filed March 11, 2008

Before: William C. Canby, Jr., David R. Thompson, and
Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.

2303

**COUNSEL**

Elliot L. Bien, Bien & Summers LLP, Novato, California, for the plaintiffs-appellants.

C. Brad Woodford, Moyes Storey Ltd., Phoenix, Arizona, for the defendants-appellees.

## OPINION

MILAN D. SMITH, JR., Circuit Judge:

Plaintiffs-Appellants, F.G. Budnick, and the development company of which he is the chief executive officer, Tempo, Inc. (collectively, Budnick), sued Defendants-Appellees, the Town of Carefree and four Town Council members[1] (collectively, Carefree) after Carefree denied Budnick's request for a Special Use Permit (SUP) to build a multi-level continuing-care retirement community in Carefree. Budnick claimed that by denying the SUP, Carefree had violated the Fair Housing Amendments Act of 1988 (FHAA), the Americans with Disabilities Act (ADA), 42 U.S.C. § 1983, the Rehabilitation Act, and Budnick's rights to due process and equal protection under the Fourteenth Amendment. The district court granted summary judgment in Carefree's favor on all claims. Budnick now appeals the district court's grant of summary judgment on his FHAA claim.[2] We affirm the decision of the district court.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

In August 2003, Budnick filed an application for Site Plan Approval and a SUP with the Town of Carefree. Budnick sought the SUP to build the Residences at Carefree (RAC),

---

[1]Budnick sued Edward C. Morgan, the Mayor and a Town Council member, and Bob Coady, Mike Eicher, and Wayne Fulcher, Town Council members.

[2]Though the district court's grant of summary judgment applied to all of Budnick's claims, we address only the FHAA claim because Budnick did not develop any arguments related to his other claims on appeal. *See* Fed. R. App. P. 28(a)(9) ("[T]he argument . . . must contain . . . appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies."); *Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1066 (9th Cir. 2004) (stating that the court does not ordinarily consider on appeal matters that "are not specifically and distinctly argued in an appellant's opening brief").

which, according to Budnick, would be a "luxurious, age restricted, senior retirement residential community" that would "primarily serv[e] the active and independent discerning senior populace." The RAC was to be located on approximately forty-acres of property that was zoned for multiple-family residences (zone R-3) and detached single-family residences (zones R1-10 and R1-35). The proposed RAC did not comply with the applicable zoning ordinances because it would provide "healthcare, meal, laundry, housekeeping" and other services that constitute "special uses," and it was to include "attached dwelling units rather than detached" units and a two-story apartment building that would exceed height limitations in the zone. The RAC plans provided for a number of other amenities, including swimming pools, interior and exterior dining areas, a café, a library, a salon, and recreation areas.

Budnick's SUP application stated that the RAC would be a "village-like community" consisting of upscale apartments (83), exclusive casitas (60), and opulent single-family homes (18). The RAC would also include an "ancillary healthcare component" consisting of six assisted-care units (four beds per unit) and four skilled-nursing units (six beds per unit). Though the residents would not own their housing, Budnick's application explained that they would enter into life care contracts upon entry and would be guaranteed housing and care for the rest of their lives, including the provision of in-home healthcare, assisted living, and skilled-nursing care "if and when such assistance becomes necessary." The application also stated that potential residents would be evaluated before acceptance and only individuals capable of independent living upon entry into the community would be accepted.

On October 13, 2003, the Town of Carefree Planning and Zoning Commission held a hearing on Budnick's application. During this hearing, representatives of Budnick indicated that RAC residents would be "active, vibrant members of the community." Budnick made similar representations in a letter to

the Mayor and Town Council members on November 26, 2003; in that letter, Budnick emphasized that RAC "entry [would be] *restricted* to healthy, active, independent seniors who will be impossible to tell apart from many of their neighbors throughout Carefree as they drive, walk, bike, shop, attend, participate, volunteer, teach, learn and enjoy life . . . ." (Emphasis added.) The letter further stated that the skilled nursing component "will be held in reserve for *temporary acute needs*." (Emphasis added.) The Commission voted four to one, with one abstention, to deny the SUP.

The Commission's denial of the SUP was appealed to the Town Council, which held a public hearing on the appeal on December 2, 2003. At that meeting, the Town's legal counsel explained that under his reading of Arizona Revised Statute § 9-462.04,[3] the Town Council needed a supermajority vote to grant the SUP because at least 20% of the owners surrounding the proposed community had filed written protests.[4] Budnick was informed of this supermajority requirement a few hours before the meeting. The Town Council voted four to three to deny the SUP.

---

[3]Arizona Revised Statute § 9-462.04(H) provides, in relevant part:

> If the owners of twenty per cent or more either of the area of the lots included in a proposed change, or of those immediately adjacent in the rear or any side thereof extending one hundred fifty feet therefrom, or of those directly opposite thereto extending one hundred fifty feet from the street frontage of the opposite lots, file a protest in writing against a proposed amendment, it shall not become effective except by the favorable vote of three-fourths of all members of the governing body of the municipality.

[4]Carefree's attorney explained that section 9-462.04(H) did not put time constraints on or set forth procedures for the filing of written protests, but explained that there was some uncertainty as to whether the 20% requirement had been met because Carefree's zoning ordinance required written protests to be submitted within seven days of a Planing & Zoning meeting. He concluded, however, on the basis of letters from property owners, petitions filed that morning, and "speaker slips," that more than 20% of the property owners opposed the RAC.

On December 30, 2003, an attorney sent a letter on behalf of those developing the RAC and, for the first time, asserted that the RAC would serve "disabled residents" in the skilled-nursing and assisted-living units. The letter stated that the laundry, kitchen, healthcare, and restaurant facilities were necessary to provide services to those disabled residents and requested reasonable accommodation under 42 U.S.C. § 3604(f)(3)(B).

Carefree and Budnick met in January 2004, and Carefree offered a variety of options to Budnick so that the RAC might still be built, including: (1) helping Budnick to locate the project on a piece of land to be sold by the State Land Department that would be appropriately zoned; (2) reconsidering the application if commercial features were moved across the street to commercially zoned property; and (3) reconsidering the application if commercial features were scaled back to a size that would accommodate only the RAC's disabled residents. Budnick did not accept any of these alternatives and subsequently filed this lawsuit.

## II. JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction to hear this appeal under 28 U.S.C. § 1291. We review a district court's grant of summary judgment de novo. *Hardage v. CBS Broad., Inc.*, 427 F.3d 1177, 1183 (9th Cir. 2005).

## III. DISCUSSION

**[1]** The FHAA forbids discrimination in the sale or rental of housing, which includes making unavailable or denying a dwelling to a buyer or renter "because of a handicap of . . . a person residing in or intending to reside in that dwelling after it is sold, rented, or made available." 42 U.S.C. § 3604(f)(1)(B).[5] Title VII discrimination analysis is used to

---

[5]The FHAA extended the Fair Housing Act's protection against discrimination in the sale or rental of housing to those with disabilities. Fair

examine claims under the FHAA; thus, a plaintiff may establish discrimination in violation of the FHAA under a theory of disparate treatment or disparate impact. *Gamble v. City of Escondido*, 104 F.3d 300, 304-05 (9th Cir. 1997) (citing *Pfaff v. U.S. Dep't of Hous. & Urban Dev.*, 88 F.3d 739, 745 & n.1 (9th Cir. 1996) & *Ring v. First Interstate Mortgage, Inc.*, 984 F.2d 924, 926 & n.2 (8th Cir. 1993)). Under § 3604(f)(3)(B) of Title 42, a plaintiff may also sue on the theory that a local municipality failed to make reasonable accommodations for housing for the disabled. *Id.* at 305. Budnick asserted its discrimination claim under all three of these theories. We consider each theory in turn.

## A.   Disparate Treatment

**[2]** When disparate treatment is claimed as a result of the denial of a special use permit, the plaintiff must establish that: (1) the "plaintiff is a member of a protected class"; (2) the plaintiff "applied for a [special] use permit and was qualified to receive it;" (3) the permit was denied despite plaintiff's qualification; and (4) "defendant approved a [special] use permit for a similarly situated party during a period relatively near the time" it denied plaintiff's request. *See id.* at 305 (setting forth the elements of a prima facie case for disparate treatment claim based on a denial of a conditional use permit). The burden then shifts to the defendant to articulate "a legitimate, nondiscriminatory reason for its action." *Id.* at 305; *see also Sanghvi v. City of Claremont*, 328 F.3d 532, 536 n.3 (9th Cir. 2003) (noting that *McDonnell Douglas* framework developed in the Title VII context extends to FHA and ADA claims). The plaintiff must then prove by a preponderance of

---

Housing Amendments Act of 1988, Pub. L. No. 100-430, § 6(a), 102 Stat. 1619 (1988). Though the FHA and the FHAA use the term "handicap," 42 U.S.C. § 3604, we use the preferred term, "disabled," except when referring to the statutory language. *See Giebeler v. M & B Assocs.*, 343 F.3d 1143, 1146 n.2 (9th Cir. 2003). We assign identical meanings to these terms.

the evidence that the defendant's asserted reason is a pretext for discrimination. *Gamble*, 104 F.3d at 305.

In lieu of satisfying the elements of a prima facie case, a plaintiff may also "simply produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated" the challenged decision. *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1122-23 (9th Cir. 2004) ("[I]t is not particularly significant whether [a plaintiff] relies on the *McDonnell Douglas* presumption or, whether he relies on direct or circumstantial evidence of discriminatory intent to meet his [initial] burden"); *see also Metoyer v. Chassman*, 504 F.3d 919, 931 (9th Cir. 2007) (stating that a plaintiff suing under 42 U.S.C. § 1981, like a plaintiff bringing a suit for disparate treatment, may proceed under the *McDonnell Douglas* framework or by producing direct or circumstantial evidence showing that a discriminatory reason "more likely than not" motivated the employer) (citing *McGinest*, 360 F.3d at 1122); *Lowe v. City of Monrovia*, 775 F.2d 998, 1006 (9th Cir. 1985), *amended on other grounds by* 784 F.2d 1407 (9th Cir. 1986) ("[A] plaintiff can establish a prima facie case of disparate treatment without satisfying the *McDonnell Douglas* test.").[6] Under either method, however, the plaintiff must counter the defendant's explanation with some evidence suggesting that the challenged action "was due in part or whole to discriminatory intent." *McGinest*, 360 F.3d at 1123.

Budnick cannot satisfy all the elements of a prima facie case for disparate treatment and has not pointed to direct or circumstantial evidence of discriminatory intent. Nor can Budnick rebut the non-discriminatory reasons Carefree has proffered to explain why it denied the SUP.

---

[6]*Sanghvi* is not inapposite, as Carefree suggests. In *Sanghvi*, we stated that there was no dispute as to whether a prima facie showing was required in that particular FHA case. *See* 328 F.3d at 536 n.4. We did not state that direct or circumstantial evidence demonstrating discriminatory intent would never be sufficient.

**[3]** Though we agree with the district court that Budnick can meet the second and third elements of the prima facie case, we do not agree that Budnick has raised a genuine dispute of fact with respect to the first element: whether the RAC would house individuals with disabilities. Budnick suggests that the RAC would naturally house disabled individuals because the senior citizen residents of the RAC would have entered into life care contracts and would inevitably experience disabilities as they age. We hold that potential RAC residents do not presently qualify as disabled under the FHAA simply because some of them will become disabled as they age. To hold that they can currently be considered disabled under the FHAA would mean, in effect, that *every senior citizen* (indeed, *every person*) desiring to rent or buy housing could assert a present claim of discrimination based on inevitable disability due solely to the passage of time. Such a holding would also disregard the reality that even if many individuals become disabled as they age, many do not, and that being old is not, *per se,* equivalent to being disabled.

*Bragdon v. Abbott*, 524 U.S. 624 (1998), does not require a different construction of the FHAA. In *Bragdon*, the Court held that a person with HIV that had not progressed to the symptomatic phase was disabled within the meaning of the ADA. The *Bragdon* court noted, however, that, at that time, HIV followed "a predictable . . . and unalterable course." *Id.* at 637 ("In light of the immediacy with which the virus begins to damage the infected persons's white blood cells and the severity of the disease, we hold it is an impairment from the moment of infection . . . . HIV infection must be regarded as a physiological disorder with a constant and detrimental effect on the infected person's hemic and lymphatic systems from the moment of infection."). In contrast, the consequences of aging are entirely unpredictable, and are sometimes treatable.

Moreover, the undisputed facts confirm that Budnick repeatedly informed Carefree that the RAC's residents would be healthy and active, and that Budnick did not claim, prior

to Carefree's denial of the SUP, that the RAC would house disabled residents. *See* 42 U.S.C. § 3604(f)(1)(B) (discrimination under FHAA must be "*because of a handicap* of . . . a person residing in or intending to reside in that dwelling after it is sold, rented, or made available" (emphasis added)); *id.* § 3602(h)(1)-(3) (defining "handicap" as "a physical or mental impairment which substantially limits one or more of such person's major life activities; a record of having such an impairment; or being regarded as having such an impairment"); *cf. Gamble*, 104 F.3d at 303-04 (noting that the structure at issue was to house fifteen "physically disabled elderly"); *Collings v. Longview Fibre Co.*, 63 F.3d 828, 834 (9th Cir. 1995) (noting, in an ADA case, that there was no showing the employer had any knowledge of the employee's alleged disability and that the employee was fired because of it).

Budnick's SUP application stated that the RAC would "primarily serv[e] the active and independent discerning senior populace," that the potential residents would be "evaluated" before acceptance, and that only individuals capable of independent living upon entry would be accepted as residents. In a letter dated November 26, 2003, Budnick made emphatic representations about the residents that would live at the RAC; Budnick wrote that "entry [would be] *restricted* to healthy, active, independent seniors who will be impossible to tell apart from many of their neighbors throughout Carefree as they drive, walk, bike, shop, attend, participate, volunteer, teach, learn and enjoy life . . . ." (Emphasis added.) It is not significant that Carefree was aware that healthcare service would be available to all RAC residents after entry; the mere availability of healthcare in no way suggests that the RAC's residents would be disabled within the meaning of the FHAA.

The fact that the RAC was to provide assisted-living and skilled-nursing units does not alter our analysis. Not only did Budnick represent in its SUP application that only individuals capable of independent living would be accepted, but Budnick

also stated in its November letter, just before the December Town Council meeting, that the skilled-nursing component "will be held in reserve for temporary acute needs." Budnick did not assert that the assisted-living and skilled-nursing units would house the disabled until its December 30, 2003 letter, which Budnick sent after the Town Council had already denied the SUP.

**[4]** Budnick also cannot satisfy the fourth element of the prima facie case. In *Gamble*, the plaintiff-landowners sued the defendant-city after the city denied a building permit to construct a complex that would house some physically disabled elderly adults. *Gamble*, 104 F.3d at 303. We noted that the landowners could not meet the fourth element because the record did not inform the court of the dates on which permits for other large structures (e.g., an apartment complex, a mobile home park, a multi-story church) in the vicinity were granted or "whether other factors, such as the composition of the city council or the related zoning ordinances, had changed since the prior permits were granted." *Id.* at 305. Similarly, here, Budnick has not set forth evidence to create a triable issue of fact as to whether Carefree has approved a SUP "for a similarly situated party during a period relatively near the time" it denied Budnick a SUP. *Id.*

Budnick asserts that "there were many other 'commercial' structures and uses in those neighborhoods," but admits that it has not provided "the dates on which the 14 nonresidential structures and uses had wound up in Carefree's residential districts." Moreover, Budnick does not contest the district court's factual determinations that the parties to those nonresidential structures were not similarly situated because two of the properties were to be located on properties zoned differently from those at issue here, a number of the structures were put in place before Carefree was founded, and the three churches identified were contemplated in Carefree's general plan.

Carefree has set forth at least two reasons for denying the SUP: (1) to achieve its zoning goals, and (2) to preserve the character of the neighborhood. Both of these reasons were reflected in the comments of the zoning commissioners and Town Council members when they explained their votes against the SUP, and both of these reasons are legitimate and nondiscriminatory. In *Gamble*, we held that concern for the residential character of the neighborhood is a legitimate and nondiscriminatory goal. 104 F.3d at 306. Though Budnick made an effort to ensure that the RAC would aesthetically blend in with its surrounding neighborhood, Budnick never-theless required a SUP because certain aspects of the RAC did not meet all of the requirements of the residential zones on which it would have been located. And, a city's interest in achieving its zoning goals has long been recognized as a legit-imate governmental interest. *See id.* at 307 (citing *Vill. of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 386-88 (1926)) ("Zoning concerns are recognized as legitimate governmental goals."); *see generally Penn. Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 129 (1978) ("[T]his Court has recog-nized, in a number of settings, that States and cities may enact land-use restrictions or controls to enhance the quality of life by preserving the character and desirable aesthetic features of a city.") (collecting cases).

Budnick points to numerous pieces of evidence that, in its view, raise a triable issue of fact as to whether Carefree's rea-sons for denying the SUP were a pretext for discrimination against the disabled or are sufficient, in lieu of establishing a prima facie case, to demonstrate that a discriminatory reason more likely than not motivated Carefree's decision to deny Budnick a SUP. Even viewing the evidence in the light most favorable to Budnick, it does not support the conclusion that discrimination played a role in Carefree's decision.

Budnick suggests that "Carefree repeatedly rejected hous-ing tailored for seniors with disabilities in residential neigh-borhoods," but Budnick admits that in both of the two cited

instances, Carefree steered the projects into areas that were not zoned residential. Thus, this evidence demonstrates only that Carefree has consistently been concerned with maintaining the residential character of its neighborhood by adhering to its zoning ordinances.

Budnick again points to the presence of other commercial uses in Carefree's residential areas as evidence supporting discrimination. This evidence is not persuasive, however, because, as explained above, these other uses were distinguishable from those contemplated in the RAC.

**[5]** Budnick suggests that discrimination can be inferred from the fact that Carefree's "General Plan" stated that Carefree was designed to cater to a retirement lifestyle. Nothing in the record suggests that the Planning and Zoning Commission or Town Council did not generally support RAC's location in Carefree; in fact, multiple commissioners and Town Council members stated that they thought the RAC was a good idea if located somewhere else in Carefree. Indeed, Carefree offered to assist Budnick in locating the RAC elsewhere in Carefree. Budnick suggests that the "frivolous" nature of the accommodations itself suggests a discriminatory intent. Given that Carefree offered three different options to Budnick on how the RAC might still be able to locate in Carefree, including reconsidering the application if commercial features were scaled back to a size that would accommodate only the RAC's disabled residents, we cannot infer a discriminatory intent.

There is also nothing suspect about the fact that Carefree characterized the RAC as "commercial." While the RAC was residential in some respects, when viewed as a whole, it was clearly a for-profit endeavor with commercial elements.

The comments of neighbors also do not show any discriminatory motive on Carefree's part. Budnick claims that neighbors' comments at zoning hearings, for example, that they were concerned about the presence of ambulances, or that

Carefree would be a place people came to die, evidence discriminatory intent. Carefree's zoning ordinance required the holding of a public hearing to determine whether granting the SUP would "serve the public health, safety, and welfare" and to allow the neighbors to comment on the RAC. Indeed, permitting town councils, planning commissions, and the like to hear the views of concerned citizens and other interested parties about proposed projects is the essence of all zoning hearings. There is no evidence in the record to suggest that the cited comments or similar ones, which were a small part of the total comments, motivated the commissioners or Town Council members to vote against the SUP, and we decline to make such an inference based solely on the fact that the comments were made. *See MetroPCS, Inc. v. City and County of San Francisco*, 400 F.3d 715, 736-37 (9th Cir. 2005) (declining to conclude that city board's decision to deny a conditional use permit was influenced by certain public comments just because board stated that it "reviewed and considered" all public comments, "which is exactly what a local zoning board is supposed to do at a public hearing").

Likewise, Carefree's adoption of a supermajority voting rule shortly before the meeting does not suggest any discriminatory motive. Regardless of whether the technical application of the cited Arizona statute was correct, Carefree's legal counsel offered a reasonable explanation for why he decided to implement what he viewed as the statutory requirement and gave Budnick notice that the supermajority required would be in effect. There is no evidence to suggest that Carefree applied the supermajority requirement for any reason other than to attempt to comply with section 9-462.04(H) of Arizona law.

Finally, we cannot infer a discriminatory intent from the fact that Carefree amended its zoning ordinance a few months after denying Budnick the SUP so that Continuing-Care Retirement Communities (CCRCs) such as the RAC would also need a SUP to locate in commercially-zoned areas. We

decline to read into this requirement an intent to discriminate *against the disabled*, particularly in light of our conclusion that being old is not the equivalent of having a disability.

## B.  Disparate Impact

**[6]** "To establish a prima facie case of disparate impact under the FHA, 'a plaintiff must show at least that the defendant's action had a discriminatory effect.' " *Pfaff*, 88 F.3d at 745 (quoting *Keith v. Volpe*, 858 F.2d 467, 482 (9th Cir. 1988)). In *Pfaff*, this court borrowed from Age Discrimination in Employment Act cases and stated that a FHA plaintiff must establish " '(1) the occurrence of certain outwardly neutral . . . practices, and (2) a significantly adverse or disproportionate impact on persons of a particular [type] produced by the [defendant's] facially neutral acts or practices.' " *Id.* at 746 (quoting *Palmer v. United States*, 794 F.2d 534, 538 (9th Cir. 1986)) (alterations in original). A plaintiff need not establish discriminatory intent but the discriminatory impact must be proven; an inference of discriminatory impact is not sufficient. *Id.* Statistical analysis is admissible to establish disparate impact. *Id.*; *see Palmer*, 794 F.2d at 539 (finding statistical evidence submitted by Palmer insufficient to establish that facially neutral Forest Service policies had a discriminatory impact on older employees). A defendant may rebut a plaintiff's proof of disparate impact by "supply[ing] a legally sufficient, nondiscriminatory reason." *Affordable Hous. Dev. Corp. v. City of Fresno*, 433 F.3d 1182, 1194 (9th Cir. 2006) (quoting *Pfaff*, 88 F.3d at 746-47).

**[7]** Budnick has set forth no evidence, statistical or otherwise, from which we can conclude that Carefree's permit practices have a disproportionate impact on the disabled or that there is a triable issue of fact as to the impact of Carefree's permit practices on the disabled. We have previously recognized the necessity of statistical evidence in disparate impact cases. *See, e.g.*, *Pottenger v. Potlatch Corp.*, 329 F.3d 740, 749 (9th Cir. 2003) ("Summary judgment is appropriate

when statistics do not support a disparate impact analysis.") (citation omitted). Though Budnick submitted national statistics to prove that the size of the proposal was necessary for the RAC to be financially viable, these statistics are not relevant to whether Carefree's permitting practices have a disparate impact on the disabled as compared to any other group of people. *See Mountain Side Mobile Estates P'ship v. Sec. of Housing and Urban Dev.*, 56 F.3d 1243, 1253 (10th Cir. 1995) ("In this case, the appropriate comparables must focus on the local housing market and local family statistics. The farther removed from local statistics the plaintiffs venture, the weaker their evidence becomes.")

In *Gamble*, we held that the plaintiff had not established a prima facie case of disparate impact under the FHA because he "presented no statistics or other proof demonstrating that the City's permit practices have a significantly adverse or disproportionate impact on the physically disabled or elderly." 104 F.3d at 306. Budnick attempts to distinguish *Gamble* by arguing that the housing Budnick sought to provide was completely absent in Carefree. This distinction is not persuasive. In *Gamble*, we held that the absence of a certain type of facility alone is not actionable; in other words, proof of a void in the community is insufficient proof of disparate impact. *Id.* at 306.

## C. Reasonable Accommodation

**[8]** A municipality commits discrimination under the FHAA if it refuses "to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford [the physically disabled] equal opportunity to use and enjoy a dwelling." *Gamble*, 104 F.3d at 307 (alteration in original); *see* 42 U.S.C. § 3604(f)(3)(B). To establish a claim of discrimination on a theory of failure to reasonably accommodate, "a plaintiff must demonstrate that (1) he suffers from a handicap as defined by the FHAA; (2) defendants knew or reasonably should have

known of the plaintiff's handicap; (3) accommodation of the handicap 'may be necessary' to afford plaintiff an equal opportunity to use and enjoy the dwelling; and (4) defendants refused to make such accommodation." *Giebeler v. M & B Assocs.*, 343 F.3d 1143, 1147 (9th Cir. 2003) (quoting *United States v. Cal. Mobile Home Park Mgmt. Co.*, 107 F.3d 1374, 1380 (9th Cir. 1997)).

**[9]** For the reasons we have already discussed above, *see* Section III.A. *supra*, the undisputed facts do not support that the plaintiff (here, the potential RAC residents) suffer "from a handicap as defined by the FHAA." The undisputed facts also do not support that Carefree should have known that the RAC would house disabled individuals, particularly in light of the many representations that Budnick made to Carefree about the RAC residents, including that "entry [would be] *restricted* to healthy, active, independent seniors." (Emphasis added.)

Assuming, *arguendo*, that the SUP application was itself sufficient to request a reasonable accommodation, even though it did not explicitly do so, we nevertheless conclude that Budnick also cannot meet the third prima facie element. Budnick has not set forth sufficient evidence to establish that the RAC's amenities were necessary to house disabled seniors; in other words, that "but for the accommodation, [the disabled] will likely be denied an equal opportunity to enjoy the housing of their choice." *Cal. Mobile Home Park Mgmt.*, 107 F.3d at 1380 (quoting *Smith & Lee Assocs. v. City of Taylor*, 102 F.3d 781, 795 (6th Cir. 1996)). To the extent Budnick suggests that the amenities requiring accommodation are "necessary to house the physically disabled," this suggestion is primarily based on Budnick's view that all of the RAC's residents may one day be disabled and, therefore, the amenities must have the capacity to serve all of the RAC's potential residents. Not only have we rejected this initial premise, but Budnick has also only summarily concluded that the RAC's amenities are necessary for the disabled and has not delineated for the court why each of the RAC's amenities are nec-

essary in the first place. As a result, we need not discuss the reasonableness of the accommodations Carefree offered to Budnick after it denied Budnick's application for the SUP.

## IV. CONCLUSION

For these reasons, we AFFIRM the district court's grant of summary judgment.