Girard Jones and Lindsay Jones,
Plaintiffs-Appellants-Cross-Respondents,

v.

John Baecker,
Defendant-Respondent-Cross-Respondent-
Cross-Appellant,

West Bend Mutual Insurance Company,
Intervenor-Respondent-Cross-Appellant-
Cross-Respondent.

Court of Appeals

*No. 2015AP325. Submitted on briefs November 17, 2015.
—Decided December 28, 2016.*

2017 WI App 3

(Also reported in 891 N.W.2d 823.)

239

243

On behalf of the plaintiffs-appellants-cross-respondents, the cause was submitted on the briefs of *Ryan J. Steffes* of *Weld, Riley, Prenn & Ricci, S.C.*

On behalf of the defendant-respondent-cross-respondent-cross-appellant, the cause was submitted on the briefs of *Steven G. Danielson* of *Danielson Law Offices, LLC*.

On behalf of the defendant-respondent-cross-respondent-cross-appellant, the cause was submitted on the brief of *Jeffrey Leavell* and *Christopher John Koppes* of *Jeffrey Leavell, S.C.*, Racine.

On behalf of the intervenor-respondent-cross-appellant-cross-respondent, the cause was submitted on the briefs of *Jonathan B. Lundeen* of *Mudge, Porter, Lundeen & Seguin, S.C.*, Hudson.

Before Stark, P.J., Hruz and Seidl, JJ.

¶ 1. HRUZ, J. Girard and Lindsay Jones appeal a judgment dismissing their state and federal disparate treatment housing discrimination claims against John Baecker. The Joneses' race discrimination claims rest principally on Baecker's explicit identification of Girard as "African American," and the Joneses' family status discrimination claims rest principally on Baecker's stated belief that the Joneses' desired rental unit was too small to accommodate their six-person family. We conclude the circuit court properly granted summary judgment to Baecker because no reasonable fact finder could conclude, on this record, that race or family status was a substantial factor motivating Baecker's refusal to rent to the Joneses. Accordingly, we affirm the circuit court on this issue.

¶ 2. West Bend Mutual Insurance Company cross-appeals the circuit court's determination that the complaint's allegations triggered its insurance policy obligation to defend Baecker against the Joneses' intentional discrimination claims. We agree with West

Bend: the allegations, analyzed in light of the relevant case law, did not trigger West Bend's duty to defend Baecker against the Joneses' claims because Baecker's refusal to rent to the Joneses was not an "occurrence" (i.e., an "accident") under the relevant policy language. We reverse the circuit court on this issue. Given our conclusion that West Bend had no duty to defend, we need not decide the issue raised in Baecker's cross-appeal regarding when West Bend's defense obligations were triggered.

## BACKGROUND

¶ 3. This case arises out of the Joneses' efforts to obtain rental housing in June of 2011. Lindsay is white; Girard is African American. The Joneses are married and have two children together. Additionally, Girard has two children from previous relationships. Three of the children live with the Joneses full time. The remaining child has a visitation schedule during weekends and the summer.

¶ 4. Between 2008 and September 2011, the Joneses lived in a rental property on State Street in Eau Claire. In March 2011, the Joneses began looking for another rental property. According to Lindsay, they focused their search on three-bedroom rentals in an area that would allow their children to continue attending Putnam Heights Elementary School. The Joneses did not find many locations available that met these criteria, and although they contacted ten to twenty landlords, they did not view any of those properties.

¶ 5. On June 14, 2011, Lindsay met a woman who rented from Baecker and noticed the woman's address was on Kari Drive in the Putnam Heights

area. The woman mentioned a potentially suitable vacant unit next to hers, and she provided Lindsay with Baecker's contact information. Lindsay testified she called Baecker right away from work. The telephone conversation between Lindsay and Baecker is the only contact the Joneses and Baecker had prior to this lawsuit, and it is central to the Joneses' discrimination claims. Lindsay's and Baecker's accounts of that conversation differ somewhat, although not materially.[1]

¶ 6. Lindsay testified at her deposition that at the beginning of the conversation, Baecker inquired about her family size. Lindsay informed him that there were four children and two adults in the family. Lindsay testified:

> And I explained to him that some of the children aren't always there all the time, but two, three of them are there permanently. And he said that it was too many children for his unit, so then I said, Well, I was under the impression that it was a three bedroom, and he said it was. And so I explained my situation, why I was looking because of the situation with the house.

When asked at her deposition to explain exactly what was said during the telephone conversation, Lindsay stated Baecker began asking questions about the Joneses' then-current living situation:

---

[1] Although we set forth both Lindsay's and Baecker's deposition testimony regarding the conversation here to provide a complete account of the evidence, for purposes of our summary judgment analysis we review all the summary judgment materials, including deposition testimony, in the light most favorable to the non-moving party (i.e., the Joneses). *See AccuWeb, Inc. v. Foley & Lardner*, 2008 WI 24, ¶ 16, 308 Wis. 2d 258, 746 N.W.2d 447.

[I told him t]hat we lived in a house that was being foreclosed on. There was a catastrophe in the home with the roof, and so we were actively looking and it was urgent. So I was really interested in trying to find a place, especially within that district. Kari Drive would have been perfect. I specified that we lived on the corner of State and Hamilton, and he said that he knew of that house and that we were complete pigs. I was a little taken aback by that. And he had mentioned that he had seen a dumpster there and garbage all over the place, a complete eyesore.[2]

And then he made mention to me that, Oh, you're the one with the African American boyfriend. And I said, Well, actually, that's my husband, and we're a family. And then he said that, He must not do anything around there, and laughed, had a chuckle about it, and then went back to the fact that, Well, it was just too many kids, too big of a family for his unit size.

Lindsay explained that after hearing these statements, she was not interested in continuing the conversation, politely said "thank you," and hung up the telephone. The Joneses later moved to a property in the Longfellow Elementary School area.

¶ 7. Lindsay admitted she did not seek an application from Baecker or ask to view Baecker's rental property on Kari Drive, explaining that she would not have done these things only to have Baecker "continue to laugh at me or continue to call us pigs." She also acknowledged Baecker never told her he would not rent to the Joneses because of Girard's race, but she interpreted Baecker's reference to Girard's race as a "racial comment." Lindsay agreed with the notion that Baecker articulated three specific concerns during the

2 Lindsay later recalled that in the conversation, Baecker had also mentioned toys being left in the yard. It is undisputed there was a dumpster located outside of the house for a time.

conversation: (1) his inability to accommodate a family the size of the Joneses'; (2) his impression that the Joneses had failed to maintain and keep clean the State Street rental; and (3) his repeated observations of toys strewn throughout the yard at that location.

¶ 8. At his deposition, Baecker discussed his history as a landlord and his general rental practices. Baecker has been a landlord for thirty-nine years and owns twenty-nine rental properties. He testified the first thing he does with any rental inquiry is ask for the anticipated number of occupants: "how many children do you have and, you know, are you single or are you married?" He then usually asks who was the previous landlord and the prospective tenant's reasons for moving, as well as whether any of the prospective tenants might present safety risks. Typically, an interested party would ask to see the property, and Baecker would provide an application upon request.

¶ 9. Baecker testified regarding Lindsay's phone call to him in June 2011. He had never spoken with either of the Joneses prior to that call and, though he knew of the Joneses based on observing them as he traveled by their State Street rental, he did not know specifically who they were. Baecker testified that when Lindsay told him her family size, it was clear to him "there's just too many people, it's not going to work." The Kari Drive location Lindsay was inquiring about was a "fourplex," which Baecker described as a single property consisting of four units.

¶ 10. Baecker believed the units in the Kari Drive property were unsuitable for a six-person family both because of the size of the units and because of his concerns regarding population density on the property as a whole. Baecker averred he has never rented a Kari

Drive unit, or a unit with a similar number and size of bedrooms, to more than four people at any one time. Baecker testified:

> I made the decision based on protecting the property and the other tenants because . . . you would be overrun if you had that many people in there. It's a landlord decision. It's my decision. I'm the owner. . . .
>
> So to protect my property, the value of it, and make life good for the tenants that are there, I don't let more than four people in because they're back-to-back fourplexes. Like I said, that would be 48 people,[3] and they're sharing a common [blacktop] driveway. . . . And this unit that they were looking [at] . . . doesn't even have a yard. So it is just not going to work.

He was unaware it is unlawful to refuse to show a property based on family status.

¶ 11. Baecker also discussed his earlier belief that the City of Eau Claire Housing Code (the "housing code") requirements prohibited him from renting to a family the size of the Joneses'. As Baecker now concedes, the relevant housing code provision requires a bedroom occupied by two people have at least 100 square feet, which all bedrooms in the unit at issue apparently satisfied.[4] At his deposition, Baecker stated

---

[3] Baecker's concern appeared to have been the total number of people that could hypothetically inhabit the "back-to-back" properties if he permitted six people to a unit.

[4] On appeal, Baecker insists that even though the applicable code provision did not support his understanding of the square-footage requirement, he was entitled to rely on the enforcement policy articulated by a municipal zoning employee that was consistent with his understanding. We need not address this argument because we conclude Baecker was entitled to summary judgment on the Joneses' disparate treat-

that he did not believe the housing code provision (whatever its square-footage requirements) applied to single-family rental units.[5] As a result, Baecker testified he generally applied a 120–square-foot-per-shared-bedroom rule to protect his properties. It is undisputed that this was Baecker's policy and not a regulatory requirement.

¶ 12. Baecker testified extensively regarding his knowledge of the Joneses' prior residence on State Street. Baecker testified he drove past the State Street location frequently. Baecker stated he observed "toys and junk and garbage every day." Baecker felt the State Street property was "disgusting." He disputed, however, that he had called the Joneses "pigs"; rather, he testified he told Lindsay the Joneses kept their State Street residence like a "pigsty."

¶ 13. Baecker acknowledged mentioning Girard's race during the conversation with Lindsay. He testified that he saw Girard at the State Street residence "all the time," and that, after Lindsay mentioned where she lived, he asked her, "Is that African American, is that your husband or your boyfriend?" Baecker stated this question had nothing to do with race; he wanted to know whether Lindsay and Girard were married, and he used the term "African American" merely to identify Girard. Baecker also acknowledged

ment family status discrimination claim because of his individual, neutral policy of limiting occupancy of the fourplex units at issue to a maximum of four persons, which policy does not constitute direct evidence of intentional discrimination on the basis of family status.

[5] At the time of his deposition, Baecker thought the minimum-square-foot requirement applied only to licensed rooming houses, a type of property that Baecker also owns. In fact, the relevant code provision applies to "every dwelling unit of two or more rooms."

that his comments about the State Street rental's condition came after he mentioned Girard's race. Baecker stated he was aware it was unlawful to discriminate on the basis of race.

¶ 14. Lindsay filed a written complaint with the Wisconsin Department of Workforce Development Equal Rights Division (the "Division"), in which she recounted her conversation with Baecker and asserted he "made [her] feel that there was no way he would rent to me because my husband is black and we have 4 children." The Division is vested with statutory authority to investigate alleged violations of Wisconsin's Open Housing Law, which is codified in WIS. STAT. § 106.50 (2013–14),[6] and it may issue a charge if it concludes probable cause exists to believe that unlawful discrimination has occurred. *See* WIS. STAT. § 106.50(1s), (6)(c).

¶ 15. On March 25, 2013, the Division concluded there was probable cause to believe Baecker violated WIS. STAT. § 106.50 by refusing to permit inspection of housing because of race and family status. Citing a Milwaukee County Circuit Court decision from 1982, the Division explained that race need only be a "partial motivation" for the housing decision. The Division observed that, here, it was "unclear whether avoidance or refusal to show the apartment was *because* of race, but likely that race was a factor because of explicitness and apparent context." Baecker's statements bore these qualities, the Division stated, because of his "explicit reference to [the] race of the husband, to a biracial couple by implication, and to protected family status as a family with children."

---

[6] All references to the Wisconsin Statutes are to the 2013–14 version unless otherwise noted.

¶ 16. When the Division issues a discrimination charge, any party may elect to have the claims asserted in that charge decided in a civil action in lieu of an administrative hearing. *See* WIS. STAT. § 106.50(6)(c)2m. Baecker made such an election, and the Joneses filed the present action in Eau Claire County Circuit Court on April 18, 2013. The Joneses advanced claims for violations of § 106.50 and 42 U.S.C. § 3604,[7] the latter of which is part of the federal Fair Housing Act (FHA). The basis for these state and federal claims was the same: that Baecker had discriminated against the Joneses based on Girard's race and their family status. Baecker denied these allegations.

¶ 17. West Bend had issued to Baecker a general business liability insurance policy effective between January 2011 and January 2012. On April 16, 2014, Baecker's attorney sent a letter tendering defense of the Joneses' lawsuit to West Bend. Approximately one month later, West Bend filed a motion to intervene in the Joneses' action against Baecker. West Bend also requested that the circuit court bifurcate the coverage issue from the merits of the Joneses' action and stay litigation on the merits until the coverage issue was resolved. Neither the Joneses nor Baecker opposed these matters, and the circuit court granted West Bend's motions to intervene, stay and bifurcate.

¶ 18. Despite the stay, Baecker filed a summary judgment motion on the merits. He argued he was entitled to summary judgment because: (1) the Kari Drive apartment was too small to accommodate the Joneses' family, and the housing code prohibited him

---

[7] All references to the United States Code are to the 2012 version unless otherwise noted.

renting to them; and (2) Baecker would not have rented to the Joneses had they applied because he would have discovered Girard's criminal history and a negative reference from one of their previous landlords.

¶ 19. Five days after Baecker filed his summary judgment motion, West Bend filed a motion for declaratory judgment on the coverage issue. On January 7, 2015, the circuit court denied West Bend's motion and concluded West Bend had a duty to defend Baecker from that date forward. Baecker then filed numerous letter briefs and a "Motion to Amend And/Or Relief From Judgment," all of which asserted that West Bend's duty to defend commenced at the time of Baecker's tender, on April 16, 2014. The circuit court rejected this argument and entered an order denying Baecker's motion.

¶ 20. Meanwhile, prompted by Baecker's summary judgment motion, the Joneses and Baecker continued litigating the merits of the action. The Joneses filed a response brief in opposition to the summary judgment motion in August 2014. They argued Baecker was not prohibited from renting to them by virtue of the housing code and his reliance on the housing code, as well as his discovery of Girard's criminal history and the negative landlord reference, were after-acquired evidence that affected only the damages available to the Joneses and did not bar their action. In reply, Baecker asserted the Joneses had failed to present evidence sufficient for a reasonable fact finder to conclude he had refused to rent to them on an impermissible basis.

¶ 21. The circuit court granted Baecker's summary judgment motion. Viewing the summary judgment materials in the light most favorable to the

Joneses, the court concluded there were no material issues of disputed fact. The court deemed it "apparent [Baecker] decided he was not interested in renting to [the Joneses] because of the number of children in the family." The circuit court found "no persuasive legal authority suggesting a landlord is prohibited from making an individualized determination as to whether or not his/her rental premises are suitable in size or condition for [the] prospective tenants['] proposed use." The court stated Baecker's "gratuitous comments" to Lindsay were "rude, crude, boorish and perhaps even racist," but it determined race could not have been the basis for Baecker's decision because "as Lindsay's story unfold[ed] in her deposition, it is clear [Baecker] decided not to rent" to the Joneses before he realized he knew where the Joneses previously lived and Girard's race.[8]

¶ 22. The Joneses appeal, asserting the circuit court erroneously granted Baecker's summary judgment motion and dismissed their housing discrimination claims. West Bend cross-appeals, asserting the circuit court erroneously concluded it had a duty to defend Baecker. Baecker also cross-appeals, asserting West Bend's duty to defend arose at the time of Baecker's defense tender.

## DISCUSSION

¶ 23. We review a grant of summary judgment de novo using the same methodology as the circuit court.

---

[8] Although we affirm the grant of summary judgment to Baecker, we do so on grounds different than those of the circuit court, which decision was based on the timing of Baecker's refusal to rent relative to the other comments he made to Lindsay during their conversation.

*Water Well Sols. Serv. Grp. v. Consolidated Ins. Co.*, 2016 WI 54, ¶ 11, 369 Wis. 2d 607, 881 N.W.2d 285. We first examine the moving party's submissions to determine whether they sufficiently establish a prima facie case for summary judgment. *Palisades Collection LLC v. Kalal*, 2010 WI App 38, ¶ 9, 324 Wis. 2d 180, 781 N.W.2d 503. "If they do, then we examine the opposing party's submission to determine whether there are material facts in dispute that entitle the opposing party to a trial." *Id.* Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Wis. Stat. § 802.08(2).

## I. Prohibited Discrimination

██

¶ 24. Wisconsin has a long and proud history of prohibiting racial discrimination in various facets of public life. *See, e.g.,* Wis. Stat. § 942.04 (1955); 1895 Wis. Laws, ch. 223, § 1 (providing for the protection of all persons within the state to the enjoyment of civil and legal rights at public places without regard to race and color). Since 1965, it has been unlawful in Wisconsin to discriminate in housing on the basis of "race, color, religion, national origin or ancestry." *See* 1965 Wis. Laws, ch. 439, § 4. This prohibition is currently codified at Wis. Stat. § 106.50.[9] Like § 106.50, federal law bars racial discrimination in housing. *See* 42

---

[9] "Discriminate" under Wisconsin's open housing law means "to segregate, separate, exclude, or treat a person or class of persons unequally in a manner described in (2) . . .

U.S.C. § 3604(a).[10] Federal courts' interpretations of the FHA generally inform our interpretation of the state open housing law. *See Metropolitan Milwaukee Fair Hous. Council v. LIRC*, 173 Wis. 2d 199, 204, 496 N.W.2d 159 (Ct. App. 1992); *Chomicki v. Wittekind*, 128 Wis. 2d 188, 200, 381 N.W.2d 561 (Ct. App. 1985).

¶ 25. Over time, Congress and the Wisconsin legislature have expanded the classes of individuals protected by the fair housing laws. In 1988, Congress amended the FHA to include "certain exemptions from liability and add[] 'familial status' as a protected characteristic." *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 135 S. Ct. 2507, 2516 (2015) (citing Fair Housing Amendments Act of 1988, 102 Stat. 1619). Prompted by this federal legislation, Wisconsin undertook a comprehensive review of its own open housing law, adding "family status" as a prohibited basis for discrimination along with other changes. *See* 1991 Wis. Act. 295, §§ 5–31. In this case,

---

because of," among other things, "race, color . . . [or] family status." Wis. Stat. § 106.50(1m)(h).

There are several aspects to the prohibition on discrimination in the rental market. Paragraph 106.50(2)(a) flatly prohibits discrimination in renting, "or by refusing to negotiate or discuss the terms thereof." Under para. (2)(b), a landlord may not rely on an impermissible basis when refusing to show a rental, nor may the landlord exact "different or more stringent price, terms or conditions" when renting. A landlord is also prohibited from discriminating by advertising in a manner that "indicates discrimination by a preference or limitation"; refusing to renew a lease, causing the eviction of a tenant, or harassing a tenant; providing services or privileges associated with the rental; and a host of other activities. Paras. 106.50(2)(d)-(L).

[10] Like state law, the FHA identifies numerous specific applications of the general prohibition on discrimination in housing. *See* 42 U.S.C. § 3604(b)-(f).

the Joneses allege they have been unlawfully denied housing because of their race and family status.

## A. Racial Discrimination

¶ 26. In discussing prohibited racial discrimination, the Joneses and Baecker focus primarily on the language of the state and federal anti-discrimination laws. Typically, we begin our analysis with the language of the pertinent statutes. *State ex rel. Kalal v. Circuit Court for Dane Cty.*, 2004 WI 58, ¶ 45, 271 Wis. 2d 633, 681 N.W.2d 110. However, this principle is of limited utility here, as the Joneses and Baecker agree 42 U.S.C. § 3604(a) and WIS. STAT. § 106.50 prohibit Baecker from discriminating against prospective tenants on the basis of race. The central dispute on appeal regarding the Joneses' racial discrimination claim is whether they have presented sufficient evidence to create a genuine issue of material fact for trial on these claims.

¶ 27. Neither this court, nor the parties, have discovered any reported Wisconsin case addressing the nature and degree of evidence sufficient to support a claim for racial discrimination in housing. However, one case that addressed a related issue held that unlawful discriminatory advertisements must be of a nature suggesting "to an ordinary reader that a particular class is preferred or 'dispreferred' for the housing in question." *Metropolitan Milwaukee Fair Hous. Council*, 173 Wis. 2d at 204 (citing *Ragin v. New York Times Co.*, 923 F.2d 995, 999 (2d Cir. 1991)). We observed that "*Ragin* equates the 'ordinary reader' with the law's traditional 'reasonable person' who 'is neither the most suspicious nor the most insensitive of our citizenry.' " *Metropolitan Milwaukee Fair Hous. Council*, 173 Wis. 2d at 204 (citing *Ragin*, 923 F.2d at

1002); *see also Wentworth v. Hedson*, 493 F. Supp. 2d 559, 571 (E.D.N.Y. 2007) ("In determining whether statements indicate impermissible discrimination, a court must ask whether the statements suggest a racial preference to the ordinary listener.").

¶ 28.　For purposes of summary judgment, it is the "reasonable person" with whom we are concerned. Could a reasonable fact finder—someone who is "neither the most suspicious nor the most insensitive of our citizenry," *Metropolitan Milwaukee Fair Hous. Council*, 173 Wis. 2d at 204—viewing the evidence in the light most favorable to the Joneses, conclude that Baecker engaged in racial discrimination in violation of either 42 U.S.C. § 3604(a) or WIS. STAT. § 106.50(2)? Answering this question requires that we define the nature of the Joneses' claim and review their supporting evidence.

¶ 29.　Courts have recognized that prohibited discrimination can occur principally in two ways. The first is by disparate treatment. Disparate treatment occurs when some people are treated less favorably than others because of a protected criterion (e.g., race, color, religion, sex, or national origin). Disparate treatment "is the most easily understood type of discrimination." *International Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977). "Proof of discriminatory motive is critical" to a disparate treatment claim. *Id.* Alternatively, a plaintiff may allege that a particular practice, even if not evidencing intentional discrimination, may have a disproportionally adverse effect on minorities and other protected classes. *See Ricci v. DeStefano*, 557 U.S. 557, 577–78 (2009). The Joneses' racial discrimination claims in this case are exclusively of a disparate treatment nature.

¶ 30. A plaintiff alleging disparate treatment racial discrimination may elect to prove his or her case using either the direct method, involving the presentation of direct or circumstantial evidence of disparate treatment, or the burden-shifting framework first established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985)[11]; *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1122 (9th Cir. 2004); *Kormoczy v. Secretary, U.S. Dep't of Hous. & Urban Dev.*, 53 F.3d 821, 823–24 (7th Cir. 1995) (noting direct proof through direct or circumstantial evidence and indirect proof through the *McDonnell Douglas* inferential burden shifting method are "distinct evidentiary paths"). Here, the Joneses do not even mention the *McDonnell Douglas* burden-shifting framework. Rather, they contend they have submitted evidence establishing Baecker's discriminatory motive under the direct method.

¶ 31. The Joneses' approach in this regard is important to the analysis we undertake. Under the direct method, "[s]ummary judgment for the defendant is warranted on a disparate treatment claim 'if the plaintiff cannot produce either (a) direct evidence of discriminatory intent or (b) indirect evidence creating an inference of discriminatory intent.' " *Batista v. Cooperative De Vivienda Jardines De San Ignacio*, 776

---

[11] The Court observed that the "[t]he shifting burdens of proof set forth in [*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)] are designed to assure that the 'plaintiff [has] his day in court despite the unavailability of direct evidence.' " *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985) (quoting *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1014 (1st Cir. 1979) (alteration in *Trans World Airlines*)).

F.3d 38, 43 (1st Cir. 2015) (quoting *Gallagher v. Magner*, 619 F.3d 823 (8th Cir. 2010)). The Joneses and Baecker agree that the plaintiff's evidence, whatever its nature, must sufficiently demonstrate that discriminatory intent was "a substantial factor motivating the defendant['s] conduct." *See Casa Marie, Inc. v. Superior Court of Puerto Rico*, 988 F.2d 252, 269 (1st Cir. 1993); *accord Kitten v. DWD*, 2002 WI 54, ¶ 62, 252 Wis. 2d 561, 644 N.W.2d 649 (evidence indicated that landlord was "primarily motivated" by tenant's perceived disability); *Puetz Motor Sales, Inc. v. LIRC*, 126 Wis. 2d 168, 172–73, 376 N.W.2d 372 (Ct. App. 1985) (in age discrimination cases, a plaintiff must show that age was a "determining factor" rather than a mere factor in the decision).

¶ 32. Although the plaintiff need not establish that discriminatory intent was the sole reason for the housing decision at issue, the evidence must be sufficiently compelling so as to give rise to a reasonable inference of racial discrimination. *See Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 269 (3d Cir. 2010). While the proffered evidence need not constitute a direct admission of guilt by the defendant, a rational trier of fact must be able to infer, based on the evidence, that the defendant took a particular action because the plaintiff was a member of a protected class. *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994).

¶ 33. These standards combine to create a "high hurdle" for the plaintiff on summary judgment, as the plaintiff must satisfy two requirements. *See Anderson*, 621 F.3d at 269. First, the plaintiff must show that the evidence is strong enough to permit the fact finder to infer "that a discriminatory 'attitude was more likely

than not a motivating factor' " for the defendant's decision. *Id.* (quoting *Walden v. Georgia-Pacific Corp.*, 126 F.3d 506, 513 (3d Cir. 1997)). "Second, the evidence must be [causally] connected to the decision being challenged by the plaintiff." *Id.*

¶ 34. Here, the Joneses direct us principally to Baecker's explicit identification of Girard as "African American." Taken in isolation, this term is inoffensive and does not inherently reveal any racial animus; it appears to be a commonly used, neutral term for Americans of African ancestry. *See, e.g.,* Standards for the Classification of Federal Data on Race and Ethnicity, 60 Fed. Reg. 44,674, 44,682 (Aug. 28, 1995); *see also* WISCONSIN DEP'T OF PUB. INSTRUCTION, *Race & Ethnicity Data Collection FAQ*, http://dpi.wi.gov/cst/data-collections/student/ises/data-collection/cd-ye-child-count-data-elements/race-ethnicity-faq (reflecting data collection and reporting practices adopted in the Final Guidance on Maintaining, Collecting, and Reporting Racial and Ethnic Data to the U.S. Dep't of Educ., 72 Fed. Reg. 59, 266 (Oct. 19, 2007)).[12] Nothing in Baecker's single use of the term "African American" would allow a reasonable fact finder to find a discriminatory motive without resorting to speculation. *See also infra* ¶ 38. Consequently, there is no reasonable, unspeculative basis for a fact finder to reject Baecker's contention that the phrase was used for identification purposes only, as a description of the individual with whom Baecker believed Lindsay was in a relationship.

¶ 35. The Joneses highlight their circumstantial evidence, urging us to consider the context and timing

---

[12] A search of Westlaw's "Major Newspapers" database reveals that the term "African American" has also been used in over 6400 articles over the last decade.

of Baecker's use of the term "African American" relative to his decision not to rent to the Joneses. There are two facets to this argument. First, the Joneses appear to utilize Baecker's criticism of the cleanliness of the Joneses' former residence in an effort to give Baecker's housing decision a discriminatory flavor. Second, the Joneses argue Baecker made clear his intention not to rent to them only after mentioning Girard's race. We reject both of these arguments.

¶ 36. First, neither the Joneses' appellate arguments nor the summary judgment record establish a nexus between Baecker's identification of Girard as "African American," on the one hand, and, on the other, his statements that the Joneses failed to keep the State Street property clean and that Girard "must not do anything around there." In their appellate briefing, the Joneses go so far as to proclaim that a reasonable jury could find racial discrimination by "readily conclud[ing] Baecker's real concern was Girard being black (and thus lazy) and the family being bi-racial." However, even reading the deposition testimony in the light most favorable to the Joneses, the connection between Baecker's statements regarding Girard's race and Girard's supposed apathetic attitude toward maintenance at the State Street residence is not self-evident. Although the Joneses urge us to conclude that a reasonable fact finder could draw this connection, their argument is made in a wholly conclusory fashion, with only a few fleeting statements in their appellate brief. Without any developed argument or citation to authority on that point, we cannot conclude that a reasonable fact finder would view Baecker's criticism of the cleanliness of the Joneses' former residence as being tinged with racial animus. *See State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992)

(courts need not address undeveloped arguments); *see also National Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 743 (1st Cir. 1995) (observing that reasonable inferences drawn in the nonmoving party's favor must "flow rationally from the underlying facts.").

¶ 37. Second, we also reject the notion that a reasonable fact finder could draw an inference of racial discrimination even if it accepted the Joneses' contention that Baecker made clear his refusal to rent only after identifying Girard as "African American." Baecker's comments, considered in their totality and in the light most favorable to the Joneses, are simply too ambiguous to establish a triable issue regarding racial discrimination, regardless of their timing. *See, e.g., Anderson*, 621 F.3d at 269 ("the phrase 'you people' is too ambiguous to constitute direct evidence of discrimination when used in isolation . . . ."); *Macone v. Town of Wakefield*, 277 F.3d 1, 7 (1st Cir. 2002) ("We are not required to enter into the realm of fantasy and conjecture when reviewing a grant of summary judgment, and appellants cannot show discriminatory intent on such flimsy evidence."); *National Amusements*, 43 F.3d at 743–44 ("While ambiguous remarks may, under some circumstances, help to illuminate the summary judgment record, such remarks rarely will suffice to conceive an issue of material fact when none otherwise exists.").[13]

---

[13] The Joneses direct us to Lindsay's Division complaint, asserting the statements she made therein suggest a more direct connection between Baecker's housing decision and Girard's race. According to Lindsay's complaint, Baecker said "in a very inappropriate tone . . . and you have an African American boyfriend!" By contrast, Lindsay testified at her deposition in this litigation that Baecker stated, "Oh, you're the one with the African American boyfriend." While the

¶ 38. The Joneses also emphasize Lindsay's subjective belief that her family was the target of unlawful discrimination. It is entirely plausible Lindsay ended her conversation with Baecker feeling he had discriminated against the Joneses on the basis of Girard's race or their status as an interracial couple. However, a person's subjective belief that he or she suffered an adverse consequence as a result of discrimination, without more, is "not enough to survive a summary judgment motion, in the face of proof showing an adequate nondiscriminatory reason." *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996), *superseded by statute on other grounds as recognized in Dupree v. Warden*, 715 F.3d 1295, 1300 (11th Cir. 2013). Here, Baecker testified at his deposition he was concerned about overcrowding. Baecker's occupancy policy represented a race-neutral basis for denying the Joneses tenancy, and Lindsay's subjective beliefs about his motivations, standing alone, are therefore insufficient.

¶ 39. The Joneses also contend Baecker's statement that the units in the Kari Drive property were unsuitable for a family of their size was "likely pretext." When a plaintiff proceeds on a pretext theory, use of the *McDonnell Douglas* framework is appropri-

---

former statement is arguably akin to a direct admission from Baecker that Girard's race was a factor in his decision not to rent to the Joneses, there is no indication Lindsay's Division complaint was sworn or bears similar indicia of reliability. Her deposition testimony, on the other hand, was given under oath as evidence in this case and was subject to cross-examination. When Lindsay was sworn and tasked with providing testimony to support her claim during her deposition, she offered only the more innocuous account.

ate. *See Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 (3rd Cir. 1997). However, the Joneses did not clearly advance a race discrimination claim based on pretext before the circuit court, and their single reference to "pretext" on appeal does not represent a developed argument on that issue. *See Pettit*, 171 Wis. 2d at 646. Moreover, as previously stated, the Joneses do not attempt to apply, or even cite, the *McDonnell Douglas* standard. *See Pettit*, 171 Wis. 2d at 646 ("Arguments unsupported by references to legal authority will not be considered.").

¶ 40. Finally, the Joneses argue that, at a minimum, the case must be remanded to the circuit court for additional discovery. They argue Baecker did not assert in his summary judgment motion that "the court could determine, as a matter of law, that race was not a factor in his refusal to rent." We pause to make clear the scope of our holding. We do not hold that Baecker has established, as a matter of law, that he did not discriminate against the Joneses on the basis of race. Rather, we hold that the Joneses have presented insufficient evidence to create a genuine issue of material fact that they were subjected to disparate treatment on the basis of race. While subtle, this is a critical distinction, one reflective of the proper allocation of the burdens of production on summary judgment.

¶ 41. The Joneses seek additional discovery because, they argue, the issues before the circuit court on summary judgment were limited to the things Baecker argued in his initial summary judgment brief: (1) whether the housing code prohibited Baecker from renting to a family the size of the Joneses'; and (2) whether Baecker could defeat a claim of racial dis-

crimination through after-acquired evidence. The Joneses assert the circuit court "came up with its own theory" and, without notice to the parties, granted summary judgment on the basis of that theory. This, they argue, was an "ambush" and was both procedurally unfair and a violation of their due process rights.[14]

¶ 42. We conclude the Joneses are not entitled to a remand to obtain additional discovery. The methodology on summary judgment requires that the moving party establish a prima facie case for summary judgment, which must be rebutted by a showing that there is a genuine issue of material fact for trial. *Palisades Collection LLC*, 324 Wis. 2d 180, ¶ 9. Here, referencing his deposition testimony, Baecker claimed in his motion papers he had not engaged in prohibited race discrimination, in part because his decision was motivated by his belief that the Joneses' family was too large for his property. Given the Joneses' claims at issue, a contention that race was not "a substantial factor motivating" Baecker's decision was inherent in his summary judgment motion, as Baecker could not succeed on summary judgment without such a conclusion. *See Casa Marie*, 988 F.2d at 269.

¶ 43. Moreover, even if the Joneses did believe that Baecker's initial summary judgment brief was limited to the argument that any discriminatory mo-

[14] The only case the Joneses cite in support of this argument, *CTI of Northeast Wisconsin, LLC v. Herrell*, 2003 WI App 19, 259 Wis. 2d 756, 656 N.W.2d 794, concerned the conversion of a motion to dismiss into a summary judgment motion without notice or the opportunity to present evidence. *See id.*, ¶¶ 9–10. The circuit court here did not convert Baecker's motion to one for summary judgment, rendering the Joneses' citation to *CTI of Northeast Wisconsin* inapposite.

tive he might have had was irrelevant, Baecker's reply brief argued—clearly and directly—that the Joneses had failed to present evidence sufficient to support their race discrimination claim.[15] Thus, it was incumbent upon the Joneses to marshal all their evidence to the contrary in opposition to the motion, and it was not an unfair "ambush" for the circuit court to grant the motion on the bases that it did, nor for this court to affirm that decision on the bases we do.

¶ 44. In any event, the Joneses have not explained what a remand would accomplish in this case. The additional evidence they seek to obtain is apparently already in their possession; they suggest Lindsay could offer an affidavit "expanding on her limited deposition testimony regarding her conversation with Baecker and her understanding of the reasons for his refusal to rent." However, the contents of any newly submitted affidavit could not contradict Lindsay's prior deposition testimony without running afoul of the "sham affidavit" rule. *See Yahnke v. Carson*, 2000 WI 74, ¶ 21, 236 Wis. 2d 257, 613 N.W.2d 102.[16] Moreover, the Joneses have not explained why such an

---

[15] As a result, and contrary to the Joneses' appellate assertions, this argument did not originate with the circuit court. Although the Joneses assert a litigant is barred from making new arguments in its summary judgment reply brief, the case they cite refers to the rule of appellate procedure that prohibits an *appellant* from raising new issues in a reply brief on appeal. *See Swartwout v. Bilsie*, 100 Wis. 2d 342, 346 n.2, 302 N.W.2d 508 (Ct. App. 1981). Whereas a respondent has no opportunity to respond to arguments so raised in an appellate reply brief, parties appearing before the circuit court may request an additional opportunity for briefing or discovery, and the circuit court will typically hold a motion hearing (giving an opportunity for further argument) before deciding the matter.

[16] An exception to the "sham affidavit" rule exists if the contradiction can be "adequately explained" based on three

affidavit was not already filed in opposition to Baecker's motion for summary judgment, other than indirectly through their "ambush" argument, which, as just explained, we reject. As for the notion that further discovery is necessary to illuminate the summary judgment record regarding Lindsay's understanding of Baecker's motivations, we reiterate that Lindsay's mere belief that she was discriminated against is insufficient for purposes of summary judgment. *See Douglass*, 79 F.3d at 1430.

### B. Family Status Discrimination

¶ 45. State and federal law both prohibit discrimination in housing based on a person's family status. *See* 42 U.S.C. §§ 3602(k) and 3604; WIS. STAT. § 106.50(1m)(h), and (2). Federal law uses the term "familial status," which means, as relevant to this case, "one or more individuals (who have not attained the age of 18 years) being domiciled with" a parent or anyone having legal custody of the individual(s). 42 U.S.C. § 3602(k). "Familial status" under federal law "refers to the *presence* of minor children in the household," not to their number. *See Pfaff v. United States Dep't of Hous. & Urban Dev.*, 88 F.3d 739, 744 (9th Cir. 1996) (emphasis added).

¶ 46. "Despite its broad goal of eradicating discrimination in housing based on familial status, . . . Congress also recognized the legitimate interests local and state governments have in enacting non-

factors. *Yahnke v. Carson*, 2000 WI 74, ¶ 21, 236 Wis. 2d 257, 613 N.W.2d 102. The Joneses have not explained what new evidence Lindsay has to offer, let alone argued what adequate explanation exists for her anticipated divergent (or "expanded") accounts.

discriminatory occupancy restrictions." *Fair Hous. Advocates Ass'n v. City of Richmond Heights*, 209 F.3d 626, 632 (6th Cir. 2000). Accordingly, the FHA contains an exception providing that it was not intended to "limit[] the applicability of any reasonable local, State, or Federal restrictions regarding the maximum number of occupants permitted to occupy a dwelling." 42 U.S.C. § 3607(b)(1); *see also City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725, 728 (1995) (holding that the "absolute exception removes from the FHA's scope only total occupancy limits, *i.e.*, numerical ceilings that serve to prevent overcrowding in living quarters").

¶ 47. Here, it is undisputed that the housing code did not prevent Baecker from renting to the Joneses. Rather, at his deposition, Baecker stipulated that it was his own judgment that his rental property was too small to accommodate the Joneses' six-person family. The circuit court concluded that the federal and state open housing laws permit a landlord to make an "individualized determination" that a rental unit is too small for the proposed tenant's use. The Joneses contend this "cannot be an accurate statement of the law."[17]

¶ 48. Despite their apparent disbelief, the Joneses concede, both in their brief-in-chief and their reply brief, that federal law "allows a landlord to impose a more restrictive policy [than that contained in local, state or federal occupancy codes] so long as the restrictions are reasonable." The *Pfaff* court noted the De-

---

[17] Again, we regard the Joneses as making a direct-method, disparate treatment claim of family status discrimination given they ignore the *McDonnell Douglas* burden-shifting framework.

partment of Housing and Urban Development (HUD)'s interpretation of the 1988 amendments stated:

> [T]here is no support in the statute or its legislative history which indicates any intent on the part of Congress to provide for the development of a national occupancy code . . . .
>
> On the other hand, there is no basis to conclude that Congress intended that an owner or manager of dwellings would be unable in any way to restrict the number of occupants who could reside in a dwelling. Thus, the Department believes that *in appropriate circumstances, owners and managers may develop and implement reasonable occupancy requirements based on factors such as the number and size of sleeping areas or bedrooms and the overall size of the dwelling unit.* In this regard, it must be noted that, in connection with a complaint alleging discrimination on the basis of familial status, *the Department will carefully examine any such nongovernmental restriction to determine whether it operates unreasonably* to limit or exclude families with children.

*Pfaff*, 88 F.3d at 748 (quoting Implementation of the Fair Housing Act Amendments Act of 1988, 54 Fed. Reg. 3232, 3237 (Jan. 23, 1989)). The *Pfaff* court remarked that this 1989 HUD guidance "suggests to us that a facially neutral, numerical occupancy restriction may permissibly be based on a house's size and the number of bedrooms it contains." *Id.*

¶ 49. The Joneses do not argue that federal law currently espouses a more restrictive standard than that set forth in the 1989 HUD guidance. Instead, the Joneses argue Wis. Stat. § 106.50 should not be interpreted similarly to the manner in which HUD has interpreted the federal statute—in other words, that state law forbids landlords from imposing occupancy

limitations that are more restrictive than the relevant local, state, and federal requirements. The Joneses therefore believe their state law family status discrimination claim should go forward even if their federal claim fails.

¶ 50. The Joneses first advance a statutory interpretation argument in which they assert the plain meaning of WIS. STAT. § 106.50 precludes landlord-initiated occupancy restrictions. They contend that, unlike federal law, § 106.50(1m)(k)3. "explicitly says" that a landlord cannot discriminate against prospective tenants based on the number of children in their household. In fact, § 106.50(1m)(k)3. says no such thing; it, like its federal counterpart, refers to the *presence* of "one or more minor or adult relatives." Section 106.50's plain language does not explicitly prohibit landlords from imposing their own numerical occupancy restrictions to protect their property.

¶ 51. The Joneses acknowledge WIS. STAT. § 106.50, like 42 U.S.C. § 3607(b)(1), provides a safe harbor for landlords who refuse a prospective tenant to comply with a local, state or federal occupancy restriction. *See* § 106.50(5m)(e). However, the Joneses assert that interpreting state law to "include enforcement of *landlord-imposed* occupancy restrictions is inconsistent with the plain language [of the state safe harbor] and would render part of the provision meaningless." This contention is without the force of reason. The state safe-harbor provision is silent regarding whether landlord-initiated occupancy restrictions are permissible—it speaks only to government restrictions. Moreover, the argument that the safe-harbor statute conflicts with the practice of landlords imposing reasonable numerical occupancy limits fails to take into account that these aspects of federal law

exist in apparent harmony with one another. Whatever point the Joneses wished to make about why state law should differ from the federal rule in this regard is not evident to us.

¶ 52. The Joneses separately note that the definition of "family status" under state law is broader than the definition of "familial status" found in federal law. Why this fact should have any bearing on whether a landlord is permitted to impose reasonable occupancy policies is not self-evident, and the Joneses do not attempt to explain the point. Absent any legislative indications to the contrary, we believe WIS. STAT. § 106.50 should be interpreted parallel to its federal analog.

¶ 53. Support for this conclusion comes from the enacting legislation itself. The Prefatory Note to 1991 Wis. Act 295 states the bill incorporated changes recommended by the legislative council's special committee on fair housing legislation, which changes were, "for the most part, based on the federal fair housing amendments act of 1988." The enacting legislation makes clear that the term "family status" was meant to "incorporate the federal definition of 'familial status' and, in addition, to include other types of households," such as persons with temporary custody or periods of physical placement with a child and a "more extensive list of persons who are related." 1991 Wis. Act. 295, § 6, Note. These minor additions do nothing to aid the Joneses' argument that state law prohibits what federal law permits. Accordingly, we conclude state law, like the relevant federal law, allows landlords to impose "reasonable occupancy requirements based on factors such as the number and size of sleeping areas

or bedrooms and the overall size of the dwelling unit." *See Pfaff*, 88 F.3d at 748 (quoted source omitted and formatting altered).

■

¶ 54. The Joneses' final argument is that summary judgment is precluded because there is a genuine issue of material fact regarding the reasonableness of the occupancy restriction Baecker imposed. We disagree, as summary judgment in this case does not turn on the "reasonableness" of Baecker's occupancy policy. By virtue of this being a direct-evidence disparate treatment case, the Joneses were required to present evidence that Baecker intentionally discriminated against them based on the mere presence of children in the household. The Joneses have never explained how Baecker's imposition of a four-person occupancy limit evidences intentional discrimination against persons with children—a policy that would permit leasing the unit to, for example, a family consisting of two parents and two children. Moreover, Baecker's statements themselves do not evidence intentional family status discrimination; according to Lindsay's account, Baecker's concern was not the fact that the Joneses had children, but that they had "too many children" for his unit. We conclude that, on this record, no reasonable fact finder could find intentional family status discrimination.

## II. *Duty to Defend*

¶ 55. West Bend cross-appeals, asserting the circuit court erroneously declared it has a duty to defend Baecker. West Bend argues that because the alleged discrimination was a volitional act on Baecker's part, the complaint failed to allege an "occurrence" that

274

would trigger its duty to defend. Baecker, conversely, asserts that there has been an "occurrence" because the complaint did not allege he intentionally discriminated against the Joneses or intended to cause the Joneses emotional distress by his conduct.

¶ 56. The circuit court denied West Bend's motion for a declaratory judgment. Noting the West Bend policy defined an "occurrence" as an "accident," and relying on *Patrick v. Head of the Lakes Cooperative Electric Ass'n*, 98 Wis. 2d 66, 295 N.W.2d 205 (Ct. App. 1980), the court held that the alleged acts of discrimination constituted an "occurrence" under the West Bend policy, thereby triggering the duty to defend, because "a fair reading of the Jones[es'] complaint alleges unintended damages." We disagree that the Joneses' complaint alleged unintended damages or, perhaps more importantly, that an allegation of unintended damages is relevant to the duty-to-defend inquiry.

¶ 57. Our supreme court has recently reaffirmed the procedure used in duty-to-defend cases. "Long-standing case law requires a court considering an insurer's duty to defend its insured to compare the four corners of the underlying complaint to the terms of the entire insurance policy." *Water Well Sols. Serv. Grp.*, 369 Wis. 2d 607, ¶ 15 (citing *Estate of Sustache v. American Family Mut. Ins. Co.*, 2008 WI 87, ¶ 20, 311 Wis. 2d 548, 751 N.W.2d 845; *Doyle v. Engelke*, 219 Wis. 2d 277, 284 & n.3, 580 N.W.2d 245 (1998); and *Grieb v. Citizens Cas. Co. of N.Y.*, 33 Wis. 2d 552, 558, 148 N.W.2d 103 (1967)). Although the four-corners rule bars a court from considering evidence extrinsic to the complaint when determining whether an insurer has a duty to defend, we will "liberally construe" the com-

plaint's allegations, assume all reasonable inferences from those allegations, and resolve any ambiguity in the policy terms in favor of the insured. *Water Well Sols. Serv. Grp.*, 369 Wis. 2d 607, ¶ 15.

¶ 58. The duty to defend is broader than the duty to indemnify. *Id.*, ¶ 17. This is because a duty to defend "is based upon the nature of the claim and not on the merits of the claim." *Fireman's Fund Ins. Co. of Wis. v. Bradley Corp.*, 2003 WI 33, ¶ 21, 261 Wis. 2d 4, 660 N.W.2d 666. Accordingly, an insurer may be obligated to defend an insured against a lawsuit that is groundless, false or fraudulent, if the allegations contained within the complaint's four corners assert a claim that would be nonetheless covered if meritorious. *Id.*

¶ 59. We use an established three-step process when comparing the underlying complaint to the insurance policy terms in duty-to-defend cases:

First, a reviewing court determines whether the policy language grants initial coverage for the allegations set forth in the complaint. If the allegations set forth in the complaint do not fall within an initial grant of coverage, the inquiry ends. However, if the allegations fall within an initial grant of coverage, the court next considers whether any coverage exclusions in the policy apply. If any exclusion applies, the court next considers whether an exception to the exclusion applies to restore coverage. If coverage is not restored by an exception to an exclusion, then there is no duty to defend.

*Water Well Sols. Serv. Grp.*, 369 Wis. 2d 607, ¶ 16 (citations omitted); *see also Sustache*, 311 Wis. 2d 548, ¶¶ 22–23. If coverage is available for even one claim

alleged in the underlying complaint, the insurer has a duty to defend its insured on all claims in the lawsuit. *Water Well Sols. Serv. Grp.*, 369 Wis. 2d 607, ¶ 16.

¶ 60.　The duty to defend depends upon the terms of the insurance policy. The same rules of construction that govern all contracts are applied to insurance policies. *Folkman v. Quamme*, 2003 WI 116, ¶ 12, 264 Wis. 2d 617, 665 N.W.2d 857. Our primary goal is to give effect to the parties' intent as expressed in the policy language. *Id.* Unambiguous language in a policy is "enforced as written, without resort to rules of construction or applicable principles of case law." *Id.*, ¶ 13. If a particular clause is ambiguous, either standing alone or in the context of the entire policy, we will construe that clause in favor of the insured. *Id.*, ¶¶ 13, 19. Insurance policy interpretation and the existence of coverage under that policy present questions of law we review de novo. *Doyle*, 219 Wis. 2d at 284.

¶ 61.　Here, the insuring agreement provides, in relevant part, that West Bend will "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' . . . to which this insurance applies."[18] The policy then states that it provides coverage only for "bodily injury" caused by an "occurrence." The policy defines an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." As such, for there to have been an "occurrence," there

---

[18] West Bend concedes the Joneses' alleged emotional distress constitutes "bodily injury" under the policy. *See Doyle v. Engelke*, 219 Wis. 2d 277, 288, 580 N.W.2d 245 (1998) (a reasonable insured would understand mental, emotional or psychological conditions to be included within the concept of "bodily injury").

must necessarily have been an "accident." *See City of Jasper v. Employers Ins. of Wausau*, 987 F.2d 453, 458 (7th Cir. 1993) (citing *City of Wilmington v. Pigott*, 307 S.E.2d 857, 859 (N.C. App. 1983)).[19] We therefore turn to the Joneses' complaint to determine whether the alleged bodily injury here—emotional distress—can be fairly attributed to an "accident."

¶ 62. The complaint alleges Lindsay called Baecker to inquire about renting a unit in the Kari Drive property. According to the complaint, "Baecker would not show or rent the property to Plaintiffs because Plaintiff Girard Jones is African-American and because Plaintiffs have four minor children." Baecker's refusals allegedly affected the Joneses' ability to send their children to their desired school and caused the Joneses "humiliation, frustration, mental anguish, emotional distress" and other unspecified damages.

¶ 63. West Bend argues that nothing in the complaint suggests the existence of an "accident" that would trigger its defense obligations. Rather, West Bend contends that "[d]eciding not to rent property because of [the prospective tenant's] race or family background cannot be accidental." Relying on the meaning of the term "accident" that has developed in our case law, West Bend argues that the majority (and most recent) of state authorities addressing the matter have concluded that volitional acts intending the complained-of event—here, a refusal to rent—are not

---

[19] As noted in *City of Jasper v. Employers Insurance of Wausau*, 987 F.2d 453, 454 (7th Cir. 1993), the insurance industry typically uses standard form policies, presumably to promote consistency and predictability. As a result, a significant body of case law has developed, both in Wisconsin and other states, regarding the terms "accident" and "occurrence."

"accidents" under a liability insurance policy. Our survey of Wisconsin case law confirms that West Bend is correct on this point.

¶ 64. Over the last approximately twenty years, our supreme court has repeatedly held that, when coverage is contingent on an "accident" occurring, the insurer has no duty to defend against alleged damages that, although unexpected, are brought about intentionally by the insured's volitional conduct. In the seminal case on the matter, *Doyle*, our supreme court reviewed the "common, everyday meaning" of the term "accident," as evidenced by a dictionary definition of that word: " 'accident' is defined as '[a]n unexpected, undesirable event' or 'an unforeseen incident' which is characterized by a 'lack of intention.' " *Doyle*, 219 Wis. 2d at 289 (quoting THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 11 (3rd ed. 1992)) (alteration in *Doyle*); *see also City of Jasper*, 987 F.2d at 457 ("An 'accident' for our purposes is defined as 'an unusual, unexpected, and unforeseen event.' " (quoted sources omitted)).

¶ 65. The issue in *Doyle* was whether a complaint stating a cause of action for the then-recently recognized tort of negligent supervision of employees constituted an "event" under the relevant insurance policy, which—like the term "occurrence" in this case —was defined as an "accident." *Doyle*, 219 Wis. 2d at 289. Comparing the definitions of "negligence" (in the law) and "accident" (in the relevant policy), the court found it "significant that both definitions center on an *unintentional occurrence* leading to undesirable results." *Id.* at 289–90 (emphasis added). The court had "little trouble concluding that a reasonable insured" would expect that a covered "event" includes negligent acts. *Id.* at 290.

¶ 66. Subsequent cases have generally adhered to *Doyle*'s demarcation between an unintentional event and volitional conduct intended to bring about a particular set of circumstances. In *American Family Mutual Insurance Co. v. American Girl, Inc.*, 2004 WI 2, 268 Wis. 2d 16, 673 N.W.2d 65, for example, the supreme court again held that an "accident" is an unintentional occurrence: "The word 'accident,' in accident policies, means an event which takes place without one's foresight or expectation. A result, though unexpected, is not an accident; the means or cause must be accidental." *American Girl*, 268 Wis. 2d 16, ¶ 37 (quoting BLACK'S LAW DICTIONARY 15 (7th ed. 1999)). However, not all negligence claims allege "accidents" that give rise to a duty to defend. *See Everson v. Lorenz*, 2005 WI 51, ¶¶ 18–19, 280 Wis. 2d 1, 695 N.W.2d 298; *see also Glendenning's Limestone & Ready-Mix Co. v. Reimer*, 2006 WI App 161, ¶¶ 38, 40, 295 Wis. 2d 556, 721 N.W.2d 704; *but see Sustache* 311 Wis. 2d 548, ¶ 49 ("[C]laims of negligence normally qualify for coverage."). The key takeaway is this: volitional acts that produce a desired event are not "accidents," even if they produce unexpected and unforeseen results and even if they are precipitated by one or more negligent acts. *Sustache*, 311 Wis. 2d 548, ¶¶ 52–54; *Everson*, 280 Wis. 2d 1, ¶ 19; *American Girl*, 268 Wis. 2d 16, ¶ 37 (quoting BLACK'S LAW DICTIONARY 15 (7th ed. 1999)); *see also Schinner v. Gundrum*, 2013 WI 71, ¶ 70, 349 Wis. 2d 529, 833 N.W.2d 685.

¶ 67. We conclude the complaint here does not allege an "occurrence" triggering West Bend's defense obligations. Baecker's alleged acts in this case—his

280

refusal to rent to the Joneses on the bases of race and family status—were made volitionally. Further, assuming the truth of the complaint's allegations, Baecker intended to deny the Joneses housing on these unlawful bases. As a result, there was no "occurrence" under the relevant case law. This is true even if, as Baecker argues, he negligently *believed* his actions were permissible or he did not anticipate his conduct would cause the Joneses emotional distress.

¶ 68. Baecker's "negligent belief" argument is of no moment here because existing case law establishes that volitional conduct producing an intended event bars coverage even if there is precipitating negligence on the part of the insured. *See supra* ¶ 66, and *infra* ¶ 73. Even if Baecker believed he was justified in refusing to rent to the Joneses based on their family size, it is undisputed that he *did* refuse to rent to them. The complaint alleged he did so intentionally, on the impermissible bases of race and family status, and we must take these allegations at face value for purposes of the duty-to-defend inquiry. *See Water Well Sols. Serv. Grp.,* 369 Wis. 2d 607, ¶ 15.

¶ 69. We also reject Baecker's assertion that coverage is warranted because he did not anticipate the nature of the harm his actions would cause. Baecker cites authorities for the proposition that "even intentionally inflicted injuries . . . can be viewed as 'accidental injury' under certain circumstances." The first of these authorities, *Patrick,* can be reconciled with the *Doyle* line of cases. In addition, some portions of *Patrick,* as well as the two other authorities on which Baecker relies—*Tomlin v. State Farm Mutual Automobile Liability Insurance Co.,* 95 Wis. 2d 215, 290 N.W.2d 285 (1980), and *Fox Wisconsin Corp. v. Century Indemnity Co.,* 219 Wis. 549, 263 N.W. 567 (1935)—

appear to have been either explicitly repudiated by the supreme court or limited to their facts.

¶ 70. In *Patrick*, the insured cooperative was authorized by an unrecorded easement to cut trees that interfered with its service lines, but its employees inadvertently cut trees located outside the easement territory. *Patrick*, 98 Wis. 2d at 67. We acknowledged that while the *act* of cutting was intentional, according to the evidence, the employees did "not intend to trim more than was necessary to reasonably maintain service, and did not intend to cut or trim trees located outside of the Cooperative's easement." *Id.* at 70. The injury-causing event, while arguably volitional, resulted from an inadvertent mistake regarding the location of the easement boundaries. Thus, the wrongful cutting (i.e., property damage) truly was unintentional and the result of an "accident."

¶ 71. Baecker correctly observes that *Patrick* rejected the insurer's argument that "occurrence" and "accident" are synonymous terms. *See id.* at 69. "The term 'occurrence' originally came into use in insurance policies because a restrictive construction of the term 'accident' proved unsatisfactory to the insured, the public, and the courts." *Id.* According to *Patrick*, the change of "accident" to "occurrence" expanded coverage and permitted "consideration of the state of the mind of the actor as it relates to the resultant damage, rather than only as it relates to causation." *Id.* at 69–70 (citing 7A APPLEMAN, INSURANCE LAW & PRACTICE § 4492 (1979)). *Patrick*'s statement that the term "occurrence" affords coverage "for an intended act and an intended result if they cause damage unintended from the standpoint of the insured," if correct, gives some credence to Baecker's claim he is entitled to coverage because he did not intend to injure the Joneses. *See id.*

at 70; *see also American Girl*, 268 Wis. 2d 16, ¶ 38 (observing that "[n]either the cause nor the harm" in that case was "intended, anticipated, or expected").

¶ 72. The entirety of *Patrick*'s statement of the law regarding the meaning of "occurrence" can no longer be correct in light of *Doyle*'s progeny, among them *Stuart v. Weisflog's Showroom Gallery, Inc.*, 2008 WI 86, 311 Wis. 2d 492, 753 N.W.2d 448. In *Stuart*, the supreme court concluded there was no insurance coverage for a contractor's false, deceptive or misleading representations meant to induce the plaintiff to enter into a remodeling contract. *Id.*, ¶ 4 (plurality opinion). The *Stuart* case produced a fractured court that "was sharply divided on the underlying rationale for its decision; the case was decided by a three-justice plurality opinion and two concurrences, each of which attracted two votes." *Eberts v. Goderstad*, 569 F.3d 757, 763 (7th Cir. 2009). All of the justices, however, agreed that a misrepresentation claim under [the relevant administrative code provision] required a degree of 'volition' that was inconsistent with the idea of an 'accident.' " *Id.* at 764 (citing *Stuart*, 311 Wis. 2d 492, ¶¶ 28–35). Notably, the *Patrick* view—that an "occurrence" includes injuries and damages that are unexpected and unintended from the standpoint of the insured—garnered only two votes in *Stuart. See Stuart*, 311 Wis. 2d 492, ¶¶ 71, 82 (Bradley, J., concurring).

¶ 73. *Sustache* is also incompatible with *Patrick*'s interpretation of "occurrence." In *Sustache*, a partygoer, Jeffrey, intentionally punched Sustache. *Sustache*, 311 Wis. 2d 548, ¶ 5. The blow was fatal, but it was undisputed that Jeffrey did not intend to cause Sustache's death. *Id.* In the subsequent insurance coverage dispute, a nearly unanimous supreme court

definitively rejected any notion that mere unanticipated harm can transform an intentional act into an "accident." *Id.*, ¶ 52. According to the court, "[o]ne cannot 'accidentally' intentionally cause bodily harm." *Id.* Volitional conduct that brings about a desired event removes the event from coverage, regardless of any precipitating negligence on the part of the insured.[20] *See id.*, ¶ 54 (citing *Everson*, 280 Wis. 2d 1, ¶¶ 15, 19). In her concurrence, Justice Bradley repeated that in determining whether there is an accident, "the focus should be on the injury or damages, not on whether the action that caused the damages was intended." *Id.*, ¶ 69 (Bradley, J., concurring). This view, however, remains the minority view in Wisconsin.

¶ 74. Baecker's reliance on *Tomlin* and *Fox Wisconsin* is similarly unavailing. Tomlin, a police officer, was intentionally stabbed numerous times during a traffic stop; the supreme court concluded there was coverage under the driver's insurance policy because "the events giving rise to [Tomlin's] injuries were neither expected nor anticipated by him, and his injuries were therefore 'caused by accident' within the meaning of the policy issued by State Farm." *Tomlin,*

---

[20] Baecker argues this cannot be a correct statement of the law because "[i]f the Court were to adopt West Bend's argument that volitional acts can never be accidents, there would be few claims covered by the typical liability policy." He argues coverage would not exist for a "motorist who intentionally pull[s] out from a stop sign, run[s] a red light, [or] travel[s] in excess of the speed limit." While some jurists may espouse this view, we regard it as unsupported by Wisconsin law, *see Fetherston v. Parks*, 2014 WI App 2, ¶ 10, 352 Wis. 2d 472, 842 N.W.2d 481 (reckless driving not an intentional act precluding coverage), and it ignores how prior cases require both a volitional act and the absence of intent to cause the particular event, *see supra* ¶ 66.

95 Wis. 2d at 222. *Tomlin* relied on *Fox Wisconsin* as authority for this holding, *Tomlin*, 95 Wis. 2d at 220–22, which in turn relied on *Button v. American Mutual Accident Association*, 92 Wis. 83, 65 N.W. 861 (1896), *see Fox Wisconsin*, 219 Wis. at 551.

¶ 75. In *Schinner*, our supreme court discussed *Tomlin*, *Fox Wisconsin* and *Button*. The court concluded *Button* was correctly decided because, although it held that whether an "accident" occurred is ascertained from the standpoint of the injured party, there the intentionally injured party was the insured. *Schinner*, 349 Wis. 2d 529, ¶ 46 (citing *Button*, 92 Wis. at 84–85). However, *Fox Wisconsin*, while otherwise correct in holding there was coverage under a theater's policy for an employee's intentional act in assaulting a patron, "misconstrued *Button* by substituting the term 'injured' for 'insured.'" *Schinner*, 349 Wis. 2d 529, ¶ 47. *Schinner* attempted to justify the holding in *Tomlin*, but ultimately concluded "the rule stated in *Tomlin* comes out of an extraordinary situation and is distinguishable on that basis." *Schinner*, 349 Wis. 2d 529, ¶ 50.

¶ 76. In all, *Schinner* holds that "when an insured is seeking coverage, the determination of whether an injury is accidental under a liability insurance policy should be viewed from the standpoint of the insured." *Id.*, ¶ 52. The court made clear that "[a]nalyzing an accident from the standpoint of the injured party goes against recent insurance decisions in Wisconsin, which considered whether the *insured* acted with lack of intent in a particular incident." *Id.*, ¶ 51 (citing, *e.g., Sustache*, 311 Wis. 2d 548, ¶ 52; *American Girl*, 268 Wis. 2d 16, ¶¶ 37–49). As a "general rule, where an insured acts intentionally to cause bodily

injury to another, insurance coverage for the injury will not be available." *Id.*, ¶ 70.

¶ 77. Here, Baecker, the insured party, was alleged to have intentionally refused to rent to the Joneses on the impermissible bases of race and family status. Baecker's alleged refusal can only be interpreted as evidencing "a degree of volition inconsistent with the term accident." *See Everson*, 280 Wis. 2d 1, ¶ 19. For this reason, we conclude the authorities on which Baecker relies are inapposite. There has not been an "occurrence" in this case, and West Bend is entitled to the declaratory judgment it seeks.

¶ 78. Baecker argues on appeal that West Bend's duty to defend was triggered on the date he tendered his defense, rather than the date the court denied West Bend's motion for declaratory judgment. Our conclusion that West Bend did not have a duty to defend Baecker also resolves Baecker's cross-appeal, as there was necessarily no inception date for the duty to defend.

¶ 79. No WIS. STAT. RULE 809.25 costs allowed to any party.

*By the Court.*—Judgment affirmed in part; reversed in part.